In re ENRON CORP., et al., Debtors.

Enron Corporation, Enron Energy Services, Inc., Enron Energy Services Operations, Inc., Enron Energy Services, LLC, Enron North America Corp., and Enron Power Marketing, Inc., Plaintiffs,

v.

People of the State of California, ex rel. Bill Lockyer, Attorney General of the State of California, Defendants.

Bankruptcy No. 01–16034 (AJG).
Adversary No. 04–03386.

United States Bankruptcy Court,
S.D. New York.

Sept. 29, 2004.

Mark C. Ellenberg, David F. Williams, Edward Smith, Of Counsel, Cadwalader, Wickersham & Taft LLP, New York, NY, for Enron Corp., Enron Energy Services, Inc., Enron Energy Services Operations, Inc., Enron Energy Services, LLC, Enron North America Corp., and Enron Power Marketing, Inc.

Bill Lockyer, Attorney General of the State of California, Tom Greene, Chief Assistant Attorney General, Danette E. Valdez, Supervising Deputy Attorney General, Keith Yamanaka, Deputy Attorney General, Martin Goyette, Deputy Attorney General, Steven H. Felderstein, Christa K. McKimmy, Of Counsel, Felderstein, Fitz-

gerald, Willoughby & Pascuzzi LLP, Sacramento, CA, for the People of the State of California ex rel. Bill Lockyer, Attorney General of the State of California.

Luc A. Despins, Susheel Kirpalani, Of Counsel, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for the Official Committee of Unsecured Creditors of Enron Corp., et al.

## MEMORANDUM DECISION REGARDING THE ENRON PLAINTIFFS' APPLICATION FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTION TO ENFORCE THE AUTOMATIC STAY OR OTHER EXPEDITED RELIEF

ARTHUR J. GONZALEZ, Bankruptcy Judge.

Before the Court is the Complaint for Declaratory Judgment and Preliminary and Permanent Injunction filed by Enron Corp. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors," or "Enron Plaintiffs"), on July 9, 2004; Debtors' Memorandum of Law in Support of Application for Preliminary Injunction to Enforce the Automatic Stay or Other Expedited Relief, and Declaration of Edward Smith, filed on July 9, 2004; Opposition to the Enron Plaintiffs' Request for Preliminary Injunction to Enforce the Automatic Stay or Other Expedited Relief, filed by the State of California Attorney General's (the "Attorney General") office on July 16, 2004, ("State's Opposition"); Declarations of Steven H. Felderstein, Martin Goyette, and Keith Yamanaka in Support of Opposition to Enron's Request for Preliminary Injunction to Enforce the Automatic Stay or Other Expedited Relief, filed on July 16, 2004; Debtors' Reply Memorandum of Law in Further Support of Application for Preliminary Injunction, and Reply Declaration of David F. Williams, filed on July 16, 2004; Motion of Official Committee of Unsecured Creditors of Enron Corp., et al. (the "Committee") for Entry of Order, Pursuant to 11 U.S.C §§ 105(a) and 1109(b) and Fed.R.Civ.P. 24(a) Granting Right to Intervene in Adversary Proceeding, filed on July 16, 2004; Objection to Claims and Complaint for Declaratory and Injunctive Relief Pursuant to 11 U.S.C. §§ 105(a), 502, 510(c), 725(a)(4), and Fed. R. Bankr.P. 3007 and 7001, and 28 U.S.C. § 2201, filed by the Committee on July 22, 2004; the Attorney General's Supplemental Opposition to the Enron Plaintiffs' Request for Preliminary Injunction to Enforce the Automatic Stay or Other Expedited Relief, filed on July 26, 2004; the Debtors' Sur–Reply Memorandum of Law in Further Support of Motion for a Permanent Injunction and Supplemental Declaration of Edward Smith, filed on August 2, 2004; the Statement of the Committee With Respect to Debtors' Request for Injunction Against People of State of California, ex rel. Bill Lockyer, filed August 2, 2004; Debtors' Letter in response to the August 11, 2004 Conference Call, dated August 20, 2004; the State's Letter in response to the August 11, 2004 Conference Call, dated August 20, 2004; and the Committee's Letter in response to the August 11, 2004 Conference Call, dated August 20, 2004.

## JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this adversary proceeding under sections 1334(b) and 157(a) of title 28 of the United States Code and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to section 157(b)(2) of title 28 of the United States Code.

Venue is proper before this Court pursuant to section 1409(a) of title 28 of the United States Code.

## BACKGROUND

### A. Case Background

Commencing on December 2, 2001, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On December 12, 2001, the United States Trustee appointed the Committee, which appointment has been amended from time to time thereafter. The Committee represents the interests of all of the unsecured creditors of the Debtors. The Committee is statutorily authorized to investigate the assets and liabilities of the Debtors and the operation of their businesses, and is empowered to perform such other services as are in the interests of unsecured creditors generally. See 11 U.S.C. § 1103(c). As of the date hereof, the Debtors continue to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107 and 1108 of the Bankruptcy Code. On June 3, 4, 7, 8, 9, 10, 14, 16, 17, and 18, 2004, this Court held a confirmation hearing (the "Confirmation Hearing") to consider a plan of reorganization under chapter 11 of the Bankruptcy Code proposed by Debtors. Following the conclusion of the Confirmation Hearing, on July 2, 2004, the Debtors filed their Modified Fifth Plan of Reorganization, dated June 1, 2004 (the "Modified Plan"), which reflects certain agreements made during the Confirmation Hearing. On July 15, 2004, the Court entered findings of fact and conclusions of law supporting confirmation of the Debtors' Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"), and entered an order confirming the Plan and the global compromise of inter-estate issues embodied in the motion filed by the Debtors, approving the global compromise in the event the Plan is not confirmed or does not become effective for one or more of the proponents of the Plan. The Plan provides for the disposition of all of the Debtors' assets and the distribution of value realized therefrom in accordance with the priority scheme of the Bankruptcy Code.

The Plan now having been confirmed, and upon the occurrence of certain conditions subsequent, all prepetition claims against the Enron Plaintiffs will be discharged. Plan, § 42.3; 11 U.S.C. § 1141(d)(1). The Plan also enjoins persons asserting discharged claims from asserting those claims against the Enron Plaintiffs other than in connection with a properly filed proof of claim. The Court has entered an order providing that October 15, 2002 was the last date for filing prepetition claims against the Enron Plaintiffs.

The Attorney General had notice of, and actively participated in, the Confirmation Hearing. Near the conclusion of the Confirmation Hearing, the Attorney General filed the California Complaint.[1]

### B. Enron's Participation in the California Energy Markets

In September 1996, the California Legislature enacted legislation to restructure and deregulate the state's wholesale electricity industry. That legislation, among other things, established two new institutions: CalPX and CalISO. CalPX was established to operate and administer auction-style markets for the purchase and

---

1. The California Complaint is defined as the complaint filed by the Attorney General in the Superior Court of the State of California for the County of Alameda California state court, on or about June 17, 2004.

sale of electricity in California. Until it terminated its operations of the wholesale electricity markets in January 2001, CalPX administered markets through which wholesale electricity was bought and sold in the State of California.

CalISO was established to operate the electricity transmission grid serving most of the state and was responsible for all real-time operations, such as balancing generation and load and managing congestion of the grid. In addition to operating the congestion management system, CalISO also administered a variety of auction markets to purchase the electricity necessary to operate the transmission system reliably. These markets included the "real-time" (also known as the "imbalance") energy market for purchase of power needed to match the amount of power being supplied to the grid with the amount of energy being demanded by customers, and certain ancillary services markets, through which CalISO purchased electricity to respond to a grid system emergency or to correct a routine imbalance on the grid.

The Enron Plaintiffs participated in the California wholesale electricity markets operated and administered by CalPX and CalISO, pursuant to tariffs approved by the Federal Energy Regulatory Commission ("FERC"). Between May 2000 and June 2001—the period marking what is now known as the California Energy Crisis—the price of wholesale power in California rose to levels well above historical norms. On January 29, 2001, CalPX effectively ceased operations by suspending trading in its markets. CalPX filed a petition for relief under chapter 11 of the Bankruptcy Code on March 9, 2001. The CalISO continues to operate, but under a revised tariff that addresses the conditions that gave rise to the energy crisis.

## C. FERC Investigations and Proceedings Regarding Enron Trading Strategies and Other Market Practices

FERC has launched a comprehensive investigation of Enron's trading activities in the California electricity markets, including the commencement of enforcement proceedings against Enron (and other market participants) for monetary and other remedies. On March 26, 2003, following completion of a Final Report by FERC investigation staff concerning price manipulation in the western states' energy markets, FERC issued an order (the "Show Cause Order") directing EPMI and EES to show cause why their authority to sell power at market-based rates should not be revoked. 68 Fed.Reg. 15,712 (2003). On June 25, 2003, FERC issued an order (the "Revocation Order") immediately revoking the blanket licenses of EPMI and EES to sell power in various markets, including the California wholesale electricity markets that are the subject of the California Complaint. 103 FERC ¶ 61,343, 2003 WL 21480248 (June 25, 2003). FERC found in the Revocation Order, *inter ali* a, that EPMI and EES had engaged in "gaming" in the form of inappropriate trading strategies. The "trading strategies" identified by FERC included the same trading strategies listed in the California Complaint (e.g., "Deathstar", "Ricochet"). FERC stated in the Revocation Order that any Enron company with any plan to market wholesale power following reorganization must apply to FERC for a new authorization. Otherwise, stated FERC, "Enron would be free to continue the status quo ante through an individual ... electric power marketer that has retained its authorization." Revocation Order at 6. By Order dated January 22, 2004, FERC denied requests for rehearing of the Revocation Order. 106 FERC ¶ 61,024, 2004 WL 1483824 (Jan. 22, 2004). In companion

orders also issued June 25, 2003 (the "Gaming and Partnership Orders"), FERC found that EPMI and EES, and others who had engaged in certain trading activities in the California electricity markets, could also be found to have engaged in "gaming and/or anomalous market behavior" in violation of the CalISO and CalPX tariffs during the period from January 1, 2000 through June 20, 2001. FERC ordered EPMI, EES, and other entities to show cause in a trial-type evidentiary proceeding why they should not be found to have engaged in prohibited gaming practices, and authorized the Administrative Law Judge to recommend monetary remedies of disgorgement of unjust profits and any other appropriate nonmonetary remedies. 103 FERC ¶ 61,345, 2003 WL 21480252 (June 25, 2003) (Gaming Order); 103 FERC ¶ 61,346, 2003 WL 21480249 (June 25, 2003) (Partnership Order). The FERC-ordered evidentiary proceeding is currently in the pre-trial phase. FERC is also considering claims by third-party purchasers of electricity in the California markets administered by CalPX and CalISO seeking refunds from EPMI, EES, and other market participants for the difference between the actual prices paid and the market prices that allegedly should have prevailed absent the alleged dysfunction in those markets (the "Refund Proceedings"). The Refund Proceedings are ongoing.

The Attorney General is a very active party in all three of the ongoing FERC proceedings noted above: the Partnership proceeding, Gaming proceeding, and the Refund Proceeding. Further he has filed, and is prosecuting, claims against EPMI and other participants in the CalISO and CalPX markets. Written testimony submitted to FERC on behalf of the Attorney General describes the claims asserted in terms that are substantially identical to the claims asserted in the California Complaint. The written testimony further states that the Enron Plaintiffs are liable to the State of California for damages of approximately $1.1 billion.

## D. The Federal Government's Criminal Proceedings Involving the Enron Trading Strategies and Other Practices

In the wake of Enron's collapse and its entry into chapter 11 in December 2001, the United States government launched one of the most extensive investigations into allegations of corporate fraud and wrongdoing in the nation's history. In January 2002, the U.S. Department of Justice, with the assistance of the Treasury Department, established the Enron Task Force, which (in the words of the First Year Report to the President from the Corporate Fraud Task Force dated July 22, 2003) was charged "to investigate and prosecute all criminal matters relating to the sudden collapse of Enron Corp." The Enron Task Force includes experienced prosecutors, FBI, and IRS agents, and is coordinating its efforts with numerous other government agencies including the SEC, the CFTC, and FERC. The Enron Task Force constitutes part of the broader Corporate Fraud Task Force established by President Bush in July 2002 to investigate allegations of fraud and corruption at U.S. corporations.

Since June 2002, the Enron Task Force has brought criminal charges against 30 individuals, including 22 former Enron executives. These indictments include many of Enron's former top officials, including former Chairman and CEO Kenneth Lay, former CEO Jeffrey Skilling and former CFO Andrew Fastow. Ten defendants (in addition to the Arthur Andersen accounting firm) have been convicted to date, all pursuant to plea agreements. The work of the Enron Task Force is ongoing. A sig-

nificant part of the Enron Task Force's focus has been on California's energy markets. The United States Attorney's Office for the Northern District of California has charged three of Enron's top former energy traders based on conduct in those markets. At the time of the filing of the California Complaint, two of three energy traders, Timothy Belden and Jeffrey Richter, had pleaded guilty, and the other, John Forney, was under indictment. Some time after the filing of the California Complaint, John Forney pleaded guilty. In a press release dated August 5, 2004, (the "Press Release"), the United States Attorney for the Northern District of California stated: "With the guilty plea of John Forney, we have now obtained convictions of the top three Enron executives most directly responsible for manipulating the energy markets in California at a time unique in our history, when the lights were going off and the grid was in danger of shutting down. These executives will now be required to help obtain restitution for the same victims they defrauded, namely the citizens of California and other Western states." U.S. Dep't of Justice Press Release (August 5, 2004), http://www.usdoj.gov/usao/can/press/html/2004_08_05_forney.html.

### E. Proofs of Claim Filed by the Attorney General in the Enron Bankruptcy Cases

On August 1, 2002, this Court entered an order establishing a bar date of October 15, 2002 for the filing of claims against the Enron Plaintiffs in these cases (the "Bar Date Order"). Any claim not filed within the period prescribed by the Bar Date Order would be forever barred.

On October 11, 2002, the Attorney General filed a series of substantively identical proofs of claim (each accompanied by a "Supplemental Statement") in the Enron Plaintiffs' bankruptcy cases (the "California Claim(s)"). The California Claims contain allegations that are substantially similar to the allegations contained in, and by their express terms include all of the monetary relief sought by, the California Complaint. Each California Claim states that the Attorney General's claim "is based on the evidence that Debtors have improperly and illegally manipulated energy markets in California and the Western United States, overcharged for energy, and violated state and federal laws and regulations...." (Supplemental Statement, p. 1). The California Claims then state:

Enron's revenues from California were obtained from, among other things, the improper use of market power, market manipulation, and misrepresentations concerning power and ancillary services it was to supply and load it was to serve, and congestion it claimed to relieve. Enron's schemes included "Fat Boy", "Ricochet", "Load Shift", "Death Star", "Non-firm Export", selling of non-firm energy as firm energy, and others described in a Dec. 8, 2000 memo by Enron lawyers. (Exh. C hereto.) The evidence so far obtained indicates that the activities of Enron may have violated, or be actionable under, many laws including but not limited to the Cartwright Act, Cal. Business and Professions Code §§ 16720 et seq., the Unfair Competition law, Cal. Business and Processions Code §§ 17200 et seq., the False Claims Act, Cal. Government Code §§ 12650 et seq., Cal.Penal Code §§ 395 and 396, Cal. Public Utilities Code § 2111, federal antitrust, mail and wire fraud, and RICO statutes (15 U.S.C. § 1 et seq., 18 U.S.C. §§ 1341 et seq., 1961 et seq.), and as constituting fraud, misrepresentation, and conversion. In addition to compensatory damages, restitution or disgorgement, Enron may be liable for punitive

damages, and in some instances treble damages and penalties.

The California Claims continue, "This claim is asserted for all injury and damages caused by Enron and its affiliates and subsidiaries of any kind whatsoever to the People of the State of California by reason of energy market misconduct and overcharges...." *(Id.* p. 4).

### F. The California Complaint Filed in California State Court

Toward the end of the confirmation hearing, on or about June 17, 2004, the Attorney General filed the California Complaint in the Superior Court of the State of California for the County of Alameda. The complaint is captioned "COMPLAINT FOR RESTITUTION, DISGORGEMENT, AND/OR DAMAGES, AND CIVIL PENALTIES, (CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, CALIFORNIA CORPORATIONS CODE § 29536); DEMAND FOR JURY TRIAL." Paragraph No. 1 of the California Complaint alleges, *inter alia:* "This is a law enforcement action brought by the Attorney General of the State of California to enforce the State's police and regulatory powers...." The California Complaint alleges that, between 1998 and 2001, the Enron Plaintiffs (there defined as the Enron Defendants) engaged in a series of "manipulative and fraudulent" trading strategies (the "Enron Trading Strategies") through which they earned massive profits. Smith Decl. Ex. 1, ¶ 53. The California Complaint contains descriptive allegations of the Enron Trading Strategies, which were labeled with the following terms: "Deathstar", "Wheel–Out", Non-Firm Export", "Get Shorty", "Fat Boy", and "Ricochet" (also known as "Megawatt Laundering"). *Id.* The complaint suggests that the California energy crisis, which was alleged to have lasted from May 2000 through June 2001, was precipitated by the Enron Trading Strategies (presumably along with the market manipulation activities of other traders).

The First Cause of Action in the California Complaint alleges that the Enron Trading Strategies were unlawful, unfair, and fraudulent business practices under the California Business and Professions Code § 17200 *et seq.* Smith Decl. Ex. 1, ¶ ¶ 65–71. The Second Cause of Action alleges that the Enron Trading Strategies were willful and fraudulent business practices in violation of California Corporations Code § 29500 *et seq. Id.* at ¶ ¶ 73–81. The California Complaint alleges that, as a result, "California businesses and residents were subjected to the risks and dangers of power supply interruptions, rolling blackouts and other adverse consequences." *Id.* at ¶ ¶ 71, 81. In the Prayer for Relief, the Attorney General requests an injunction against the Enron Plaintiffs permanently enjoining them from violating California Business & Professions Code § 17200 and California Corporations Code § 29536; an order "directing Defendants to pay restitution, disgorgement and/or damages" in an unspecified amount; an order assessing civil penalties; and the award of costs.

Shortly before filing the California Complaint, the Attorney General announced his plans to sue Enron. According to press reports, the Attorney General made clear that the purpose of the lawsuit was to seek "separate damages to compensate the State for Enron's alleged market manipulation." A spokesperson from the Attorney General's office was quoted as saying: "It'd be a different pot of money."

Following the filing of the California Complaint, the Debtors notified the Attorney General's office on July 8, 2004 that they intended to file an adversary complaint in this case seeking a stay and dismissal of the California Litigation and an immediate temporary restraining order on

the ground that the California Litigation violates the automatic stay, unless the Attorney General agreed by 11 a.m. on July 9th to dismiss the California Litigation with prejudice. See Decl. Yamanaka ¶ 2. Enron subsequently notified the Attorney General's Office that rather than seeking a TRO, it would seek a preliminary injunction at a hearing on July 15th. *Id.*

On July 9, 2004, the Enron Plaintiffs commenced an adversary proceeding against the Attorney General in this Court for a declaratory judgment and preliminary and permanent injunctive relief declaring that the California Litigation violates the automatic stay of Bankruptcy Code section 362(a) and, consequently, is void *ab initio*, and an order staying, restraining and enjoining the commencement or continuation of the California Litigation under Bankruptcy Code sections 362(a) and 105. Contemporaneously therewith, the Enron Plaintiffs filed an application for a preliminary injunction to enforce the automatic stay or for other expedited relief on those same grounds (the "Stay Motion"). The Enron Plaintiffs sought an expedited hearing on the Stay Motion because of an impending answer date of July 21, 2004 to answer or otherwise respond to the California Litigation. On July 9, 2004, the Court issued an Order to Show Cause that scheduled the hearing on the Stay Motion for 2:00 p.m. on July 19, 2004.

On July 14, 2004, the Attorney General, on his own motion, obtained an extension of time for Enron to file responsive pleadings to the California Complaint until September 20, 2004. *See* Decl. Goyette ¶ 5; Reply Decl. Williams ¶ 6. Counsel for the Attorney General promptly notified counsel for Enron of the extension. *See* Decl.

Goyette ¶ 5. Enron did not agree to adjourn the hearing set for July 19, 2004, seeking an immediate injunction barring further action by the Attorney General in the California Litigation. Reply Decl. Williams ¶ 5. The California state court issued an order extending the time for Enron to respond to the complaint to September 20, 2004. *Id.* The case has since been removed by the Enron Plaintiffs to the District Court for the Northern District of California. On July 19, 2004, the Court issued a Minute Order "so ordering" the agreement between the parties set forth on the record at that hearing. Pursuant to the agreement, the State of California would not file its remand motion until the earlier of the Court's ruling on the injunction following the August 4, 2004 permanent injunction hearing, or August 13, 2004. The remaining issue before the Court regarding the Enron Plaintiffs' prayer for permanent injunctive relief under sections 362 and 105 of the Bankruptcy Code was scheduled to be heard on August 4, 2004. The Court held a hearing on that date regarding the permanent injunctive relief sought. At the Court's direction, members of its staff held a conference call on August 11, 2004 to request responses from the parties regarding the Press Release issued on August 5, 2004 by the United States Attorney's Office for the Northern District of California. The parties responded individually, by letters to the Court, on August 20, 2004. On August 12, 2004, the parties reached an agreement to extend the deadline for the State of California to file its remand motion from August 13, 2004 to and including August 30, 2004. The State of California filed its remand motion on August 30, 2004.[2]

---

**2.** At the Court's direction, a member of its staff held a conference call on September 22, 2004 to ascertain whether the remand motion had been filed by the State of California, and

if so, on what date was Enron Plaintiffs' response due. The Court was informed that the deadline for the Enron Plaintiffs to respond to the remand motion has been extended to Jan-

## ISSUE PRESENTED

The primary basis for the injunctive relief sought by the Enron Plaintiffs is premised upon a determination as to whether the California Complaint violated the automatic stay under section 362(a). Therefore, the principal issue before the Court is whether the California Complaint is filed in violation of section 362(a) or is excepted from the automatic stay by section 362(b)(4). If the automatic stay applies, the California Complaint would be void *ab initio* as a violation of the automatic stay. The underlying claims would be determined either in the claims adjudication process or relief from the stay granted to be determined in another forum. If the exception in section 362(b)(4) applies, then such action can proceed outside the claims process without relief from the automatic stay. The determination of whether the section 362(b)(4) exception applies does not effect the allowability of a refund claim or any other claim alleged in the California Complaint or what priority such a claim should receive.

## LEGAL STANDARD

The filing of a bankruptcy petition operates as a stay applicable to all entities regarding the commencement or continuation of judicial proceedings against the debtor. *See* 11 U.S.C. § 362(a)(1).[3] The protections of the stay are automatic and mandatory with the filing of the bankruptcy petition. *Elder–Beerman Stores*

Corp. v. Thomasville Furniture Indus. Inc. (In re Elder–Beerman Stores Corp.), 195 B.R. 1019, 1023 (Bankr.S.D.Ohio 1996). The automatic stay applies to the commencement or continuation of declaratory judgment actions against the debtor. *See Commercial Union Ins. Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 31 B.R. 965, 970 (S.D.N.Y.1983) (affirming bankruptcy court's conclusion that automatic stay applied to pending declaratory judgment action); *Advanced Computer Servs. v. MAI Sys. Corp.,* 161 B.R. 771, 774–75 (E.D.Va.1993) (concluding that section 362(a)(1) applied to complaint filed postpetition seeking declaratory and equitable relief).

The scope of the automatic stay is broad, *see AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.),* 117 B.R. 789, 798 (Bankr.S.D.N.Y.1990) ("Congress intended that the scope of the automatic stay be broad in order to effectuate its protective purposes on behalf of both debtors and creditors ...."), and is a fundamental debtor protection, *e.g., Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc.,* 157 F.3d 169, 172 (2d Cir. 1998) (citing legislative sources), that not only protects debtors but protects creditors as well. *See, e.g., Keene Corp. v. Coleman (In re Keene Corp.),* 164 B.R. 844, 849 (Bankr.S.D.N.Y.1994). It has been observed that:

> The automatic stay ... promote[s] two principal purposes of the Bankruptcy

uary 20, 2005. Further, the Court was informed that pursuant to a stipulation between the parties, the deadline for the Enron Plaintiffs to file its Answer to the California Complaint has been extended to October 20, 2004.

**3.** Section 362(a)(1) provides:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities

Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—
the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

Code. First, the automatic stay provides the debtor with a breathing spell from ... creditors. [Second,] the automatic stay allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.

*Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.),* 922 F.2d 984, 989 (2d Cir.1990) (internal citations and quotation marks omitted). Section 362(b) of the Bankruptcy Code provides for certain limited exceptions to the automatic stay, including actions by a governmental unit to enforce its police or regulatory power. Section 362(b)(4) of the Bankruptcy Code provides that the filing of a bankruptcy petition does not operate as a stay against:

the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a monetary judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

*Id.* However, even if a government action is a proper exercise of the police power, the collection of a money judgment is barred by the stay and can only occur (if at all) in the bankruptcy court in connection with the debtor's distribution of estate assets to creditors. *Id.; see also, e.g., City of New York v. Exxon Corp.,* 932 F.2d 1020, 1024 (2d Cir.1991).

■ The legislative history of section 362(b) makes clear that Congress intended that courts give the exceptions in section 362(b) a narrow construction:

This section is intended to be given a narrow construction in order to permit governmental units to pursue action to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.

*In re Chateaugay,* 115 B.R. 28, 32 (Bankr. S.D.N.Y.1988) (citing 124 Cong. Rec. 32, 395 (1978) (Statement of Rep. Edwards); 124 Cong. Rec. 33,995 (identical statement of Sen. DeConcini)). In adopting section 362(b)(4), the police power exception to the automatic stay, Congress explained that "where a governmental unit is suing a debtor *to prevent or stop* violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such law, the action or proceeding is not stayed under the automatic stay." H.R.Rep. No. 595, 95th Cong., 1st Sess. 343 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6299, S.Rep. No. 989, 95th Cong., 2d Sess. 52 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5838 (emphasis added).

In *Board of Governors v. MCorp Fin., Inc.,* 502 U.S. 32, 40, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991), the United States Supreme Court rejected the theory that a bankruptcy court must first determine "whether the proposed exercise of police or regulatory power is legitimate", as that "would require bankruptcy courts to scrutinize the validity of every administrative or enforcement action brought against a bankrupt entity." *Id.,* 112 S.Ct. at 465. The Court further enumerated that "[s]uch a reading [of section 362(b)(4)] is problematic, both because it conflicts with the broad discretion Congress has expressly granted many administrative entities and because it is inconsistent with the limited authority Congress has vested in bankruptcy courts." *Id.*

■ After *MCorp,* 502 U.S. 32, 112 S.Ct. 459, courts moved away from any analysis of the legitimacy of the underlying action. Instead, courts look only to the purpose of the law that the governmental unit is attempting to enforce to determine whether the section 362(b)(4) exception applies. *Safety–Kleen, Inc. v. Wyche, et al. (In re Pinewood),* 274 F.3d 846, 865 (4th Cir.2001). The exception applies if the purpose of the law is to promote "public safety and welfare" or to effectuate public policy. *Id.* at 865 (quoting *Universal Life Church, Inc. v. United States (In re Universal Life Church, Inc.),* 128 F.3d 1294, 1297 (9th Cir.1997)). However, if the purpose of the law relates "to the protection of the government's pecuniary interest in the debtor's property," or to adjudicate private rights, the exception is inapplicable and the automatic stay applies. *Id.* The inquiry to determine whether the governmental entity is acting pursuant to its "police and regulatory power" or acting to protect is status as a creditor is objective. *Id.* at 865. The court is to "examine the purpose of the law that the state seeks to enforce rather than the state's intent in enforcing the law in a particular case." *Id.* (internal citations omitted).

■ When the law that a governmental entity is seeking to enforce has a dual purpose of promoting the public welfare as well as protecting the entity's pecuniary interest, the court must "determine the *primary* purpose of the law that the [enti-

ty] is attempting to enforce." *Id.; see Yellow Cab Coop. v. Metro Taxi, Inc. (In re Yellow Cab Coop.),* 132 F.3d 591, 597 (10th Cir.1997); *Javens,* 107 F.3d at 367–68.[4]

## DISCUSSION

■ The Attorney General seeks relief provided for under the California consumer protection laws, including civil penalties, injunctive relief, restitution, disgorgement, and money damages. The Attorney General filed the California Litigation pursuant to his authority under the police and regulatory power to allegedly protect the health, safety, and welfare of California's citizens under the consumer protection laws of California, specifically, California's Unfair Competition Law and Commodity Law. The California Supreme Court has recognized that a consumer protection action brought by the state "seeking *injunctive relief and civil penalties* is fundamentally a law enforcement action designed to protect the public and not to benefit private parties." *People v. Pacific Land Research Co.,* 20 Cal.3d 10, 17, 141 Cal.Rptr. 20, 569 P.2d 125 (Cal.1977) (emphasis added). The California Supreme Court further explained the purposes of consumer protection actions: "[t]he purpose of injunctive relief is to prevent continued violations of law and to prevent violators from dissipating funds illegally obtained. Civil penalties ... are designed to penalize a

---

4. The Court notes that the United States Court of Appeals for the Ninth Circuit in *Universal Life Church,* 128 F.3d at 1299, also acknowledged that most governmental actions have some pecuniary component. The Ninth Circuit, however, appears to have misquoted the Bankruptcy Appellate Panel in *In re Thomassen,* 15 B.R. 907 (9th Cir. BAP 1981) stating, that "[o]nly if the action is pursued solely to advance a pecuniary interest of the governmental unit will the automatic stay bar it." *Universal Life Church,* 128 F.3d at 1299 (quoting *In re Thomassen,* 15 B.R. at 909). The Ninth Circuit Bankruptcy Appellate Panel, in *In re Thomassen,* stated that "[s]tate and local governmental units cannot, by an exercise of their police or regulatory powers, subvert the relief afforded by the federal bankruptcy laws. When they seek to do so for a pecuniary purpose, they are automatically stayed, notwithstanding the exception found at 11 U.S.C. 362(b)(4)." 15 B.R. at 909.

defendant for *past* illegal conduct. The request for restitution ... is only ancillary to the primary remedies sought for the benefit of the public." *Id.* (emphasis added) (internal citations omitted). In *Pacific Land Research,* the California Supreme Court further stated that restitution, while often the primary purpose of a private class action, is not the primary object of a consumer protection action. *Id.* at 18, 141 Cal.Rptr. 20, 569 P.2d 125. As explained by the California Supreme Court, the consumer protection laws in California have multiple purposes, the primary purpose designed to protect the public safety. The Court finds that the California Litigation, brought pursuant to the consumer protection laws of California, should be analyzed as a dual purpose law.

1. *The "Pecuniary Interest" Test: The Primary Purpose of the Consumer Protection Laws that the Attorney General Seeks to Enforce Is to Seek Monetary Relief and Not to Protect the Public Safety*

The Attorney General initiated the California Litigation more than two years after the allegations regarding Enron's manipulation of the energy markets in California became widely known and almost two years after he articulated virtually identical causes of action and legal theories in the California Claims.[5] In order to meet the section 362(b)(4) exception to the automatic stay, when a law has multiple purposes, the Court must find that the action is brought *primarily* to enforce the law's protection of the public safety or health of the citizens of California and not *primarily* to protect the State's pecuniary interest. Here the Attorney General advances the California Litigation primarily for restitu-

tion, which is only an ancillary purpose of the California consumer protection laws. *Pacific Land Research,* 20 Cal.3d at 17, 141 Cal.Rptr. 20, 569 P.2d 125 (holding that the request for restitution in a consumer protection action "is only ancillary to the primary remedies sought for the benefit of the public."). According to press reports, the Attorney General made clear that the purpose of the California Litigation was to seek "separate damages to compensate the State for Enron's alleged market manipulation." A spokesperson from the Attorney General's office was quoted as saying: "It'd be a different pot of money." The Attorney General is seeking to enforce the purpose of the law that relates to the protection of the State of California's pecuniary interest.

The State of California acknowledges that the purpose of the litigation is to seek restitution for wrongs to its citizens and contends that the litigation is brought also to deter future wrongdoers, including Enron. The injunctive relief sought, however, is *not* brought to "prevent continued violations of law [or] to prevent violators from dissipating funds illegally obtained," *Pacific Land Research,* 20 Cal.3d at 17, 141 Cal.Rptr. 20, 569 P.2d 125, but as the Attorney General argued, to provide an easier course of action to penalize Enron if it were to enter into business again. Aug. 4, 2004 Hearing Tr. 48:8–49:14. In that if Enron, some time in the future, (1) applied for, (2) was granted reinstatement of its license, (3) engaged in business in California, and (4) violated the consumer protection laws at issue in the California Litigation; the State of California could bring an action for the violation of a court order as well as an action based upon the violation of the consumer protection laws. *Id.* Fur-

---

**5.** As previously defined, the California Claims refers to the proofs of claim filed on behalf of the State of California.

thermore, the Court finds that the injunctive relief sought by the Attorney General under the circumstances presented is a meaningless request. The record of the Enron bankruptcy and FERC's actions make it practically impossible for Enron to resume trading and therefore, the need for an injunction to prevent Enron's participation in the California markets has been eviscerated. The Attorney General in its Opposition acknowledges that Enron may never again engage in energy trading. In fact, Enron sold its trading operations to UBS AG in January 2002.[6] *See Order Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code (1) Approving the Terms and Conditions of Agreements for the License and Related Transactions in Respect of Enron's Wholesale Trading Business, and (2) Authorizing the Consumption of the Transactions Contemplated Therein,* Docket No. 1030 (January 22, 2002), (the "Order Granting the UBS Sale"). During the August 4, 2004 permanent injunction hearing, the Attorney General also acknowledged that the Enron chapter 11 cases are in liquidation. *Id.* at 57:23–58:3 ("... this $11 billion estate that is only going to be at the liquidation stage.").

Moreover, on June 25, 2003, FERC issued an order immediately revoking the blanket licenses of EPMI and EES to sell power in various markets, including the California wholesale electricity markets that are the subject of the California Complaint. 103 FERC ¶ 61,343, 2003 WL 21480248 (June 25, 2003). FERC stated in the Revocation Order that any Enron company with any plan to market wholesale power following reorganization must apply to FERC for a new authorization. The

Attorney General argued that an injunction is appropriate to prevent Enron from engaging in future wholesale power sales: "the fact that [FERC] revoked [Enron's] license doesn't mean that [Enron] can't be in that business again by reapplying or in some other manner getting that business." Aug. 4, 2004 Hearing Tr. 48:12–15. The Attorney General acknowledged that it is not Enron's intention to reapply for a license or to sell an operating entity and that "it is not [Enron's] plan to do it and they probably won't, but the injunction would still be appropriate in light of the fact that they could." *Id.* at 48:21–24. The Court finds the Attorney General's argument is premised upon an extremely remote possibility laden with numerous contingencies that have no basis in reality. In early 2002, Enron sold its trading operations and facilitated the transfer of its traders to UBS AG. *See Order Granting the UBS Sale.* The Court finds it difficult to believe that the Enron trading name could have any value that would lead Enron to seek reinstatement of its trading authority, either (1) to engage in the trading business itself, or (2) sell a trading entity with the Enron name. In addition, based upon the Court's understanding of the UBS AG sale, Enron's consideration from the sale is based upon the future success of UBS AG's operation of the trading business, hence, Enron's entry into that business or its facilitation of another's entry would be in conflict with Enron's economic interest in any potential recovery resulting from the UBS AG sale. *See Disclosure Statement for Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code* at 248, Docket No. 15414 (January 12, 2004). The request for injunctive relief, under the circumstances

---

6. As an integral part of the sale of its wholesale trading business, Enron facilitated the transfer of its traders to UBS AG. Further, the consideration Enron received for the transaction was an economic interest in the purchaser's future success in the wholesale trading business.

presented, is an attempt to portray the California Complaint as a police and regulatory action when it is in fact solely brought in furtherance of the State of California's pecuniary interest.[7]

■ The remaining relief that the State of California seeks is money damages in restitution, disgorgement, civil penalties, and money damages. When the primary purpose of a government lawsuit is to seek money damages or other monetary relief for past conduct, and not to prevent future conduct that could harm the public health or safety, the courts hold that the police power exception to the automatic stay does not apply. *See, e.g., U.S. v. Seitles*, 106 B.R. 36, 39 (S.D.N.Y.1989), vacated on other grounds 742 F.Supp. 1275 (S.D.N.Y.1990); *Chateaugay*, 115 B.R. at 31–33; *U.S. v. Wellham (In re Wellham)*, 53 B.R. 195, 198 (Bankr.M.D.Tenn.1985) (automatic stay applied because government action was for money damages for past conduct and did not purport to stop any continuing misconduct by the debtor). The Court acknowledges the Attorney General's argument that the relief sought need not be prospective in order to satisfy the interests of public safety, however, the relief must have a deterrent impact.

In *Seitles*, the court ruled that the government's action against a corporate debtor under the False Claims Act for damages and civil penalties was barred by the automatic stay, stating that "the presence or absence of continuing harm as well as a threat to public health is relevant in determining the applicability of § 362(b)(4)", 106 B.R. at 39, the court concluded that "the present case involves no threat to public health or safety" and that the misconduct in question (fraudulently obtained printing contracts) "posed only a monetary, not a safety, threat to the government." *Id.* Furthermore, because the corporation no longer supplied its services to the government and its president had been convicted in a criminal trial, the court concluded that the lawsuit "does not serve to stop any continuing misconduct by the debtor." The government's real motive, stated the court, appeared to be "a purely pecuniary endeavor which may be addressed after the orderly settlement of the bankrupt estate." *Id.* at 40. Any Enron entity's viability as a wholesale energy trading entity was lost as a practical matter with the filing of the bankruptcy in December 2001. The decision by Enron, following the bankruptcy filing in late December 2001, to enter into a sale process for the energy trading structure, which ultimately lead to the UBS AG sale, was a recognition by Enron that it could no longer engage in the wholesale energy trading market. Thereafter, the actions by FERC, the United States Attorney's Office for the Northern District of California, and other governmental entities, make abundantly clear what was already a foregone conclusion—Enron's energy trading days were over following the bankruptcy filing and the overall collapse of the energy trading market.

The articulated "deterrent effect" that would be sought pursuant to the California consumer protections laws is to prevent continued violations and to prevent the dissipation of improperly acquired funds from the alleged violation. *See Pacific*

---

7. Even if it were argued that the injunctive relief sought in the California Complaint, although lacking any practical consequences at this time and likely at any time in the future, separately survives the "pecuniary purpose" or the "public v. private rights" tests, the Court finds that relief under section 105 would be appropriate to prevent the injunc- tive relief from going forward until the Enron Plaintiffs took some action, at a minimum, to seek reinstatement of its license before FERC (e.g., to indicate that Enron was beginning the process to enable it to engage in a business activity that would be subject to the California consumer protection laws).

*Land Research,* 20 Cal.3d at 17, 141 Cal. Rptr. 20, 569 P.2d 125. The California Litigation serves no additional deterrent value to that which is served by the FERC proceedings and the assertions regarding the criminal prosecutions. Here, as in the discussion of *Wellham* and *Seitles, infra,* there is no likelihood of any continuing misconduct by the Enron Plaintiffs. As stated above, Enron, as a trading entity, no longer exists and therefore, any concern over the possibility for the Enron Plaintiffs to violate the laws of California in the future is not a realistic concern. The Attorney General contends that, "[e]ven if Enron never again engages in energy trading, the [California Litigation] will serve as a deterrent to other wrongdoers." State's Opposition at 11. However, where criminal and other proceedings have been initiated against the debtor and/or the debtor's executives, courts have not been persuaded that deterrence is indeed the primary purpose in filing the government action. *See, e.g., Seitles,* 106 B.R. at 39–40 (the court was not convinced that the public policy reasons of loss reimbursement and deterrence were the government's primary motivation in filing its damages action where the company's president had already been ordered to pay restitution in the criminal matter, and that the deterrent value of the civil action had already been largely served by the president's criminal conviction) (internal quotations omitted).

In this case, there have been several criminal indictments, including, according to the lead prosecutor, the convictions of the top three Enron energy executives primarily responsible for manipulating the energy markets in California. As part of their guilty pleas, the three Enron executives will be required to assist the government in "determining whether other individuals at Enron should be charged in connection with the illegal manipulation of the energy markets in California and the Western states ... [and] whether other companies carried out schemes similar to Enron's for purpose of manipulating the energy markets." U.S. Dep't of Justice Press Release, *supra.*[8] Additionally, the three executives will "assist in other federal and state investigation of Enron's action during the energy crisis and assist the California parties who are trying to recover money" for the citizens of California and other Western states. *Id.* The Court is not persuaded that the California Litigation will serve an additional deterrent value than is served by these assertions regarding the federal criminal prosecutions.

Further, without reaching the merits of whether the California Litigation is preempted by the ongoing FERC proceedings in this case, as such determination would be prohibited by *MCorp.,* 502 U.S. 32, 112 S.Ct. 459, the Court finds that the FERC proceeding also addresses the public policy concerns raised by the Attorney General and the California Litigation, and is therefore duplicative. FERC has launched a comprehensive investigation of Enron's trading activities in the California electricity markets, including the commencement of enforcement proceedings against Enron (and other market participants) for monetary and other remedies. On June 25, 2003, FERC revoked the licenses of EPMI and EES to participate in the California energy market and also is-

**8.** The State has objected to the use of the Press Release as evidence of truth of the matter asserted therein. The admission of the Press Release is not done so for the truth of the matter asserted but for the fact that the assertions were made and by whom. The Attorney General does not dispute that the United States Attorney for the Northern District of California, the lead prosecutor regarding the California energy crisis, made the assertions. Therefore, the objection is overruled and the Press Release is admitted into evidence for the limited purpose set forth above.

sued companion orders Gaming and Partnership Orders, finding that EPMI and EES could also be found to have engaged in "gaming and/or anomalous market behavior" in violation of the CalISO and CalPX tariffs during the period from January 1, 2000 through June 20, 2001. FERC ordered EPMI, EES and other entities to show cause in a trial-type evidentiary proceeding why they should not be found to have engaged in prohibited gaming practices, and authorized the Administrative Law Judge to recommend monetary remedies of disgorgement of unjust profits and any other appropriate non-monetary remedies. 103 FERC ¶ 61,345, 2003 WL 21480252 (June 25, 2003) (Gaming Order); 103 FERC ¶ 61,346, 2003 WL 21480249 (June 25, 2003) (Partnership Order). The FERC-ordered evidentiary proceeding is currently in the pre-trial phase. The Attorney General has been an active participant in these proceedings.[9] The proceedings and investigation before FERC serve as deterrence to potential wrongdoers, including to those who may enter the energy markets in California. The Court finds that the California Litigation would not serve any additional deterrence beyond that which is served by the FERC proceedings.

The Court notes that this is not a case where a wrongdoer is trying to hide in Bankruptcy Court. The public interest concerns are already being addressed by, among other governmental actions, FERC and the United States Attorney's Office for the Northern District of California. The economic interests of the State of California, which are not subject to the section 362(b)(4) exception from the automatic stay, have been asserted in the bankruptcy proceedings. Therefore, having reviewed the arguments of the parties reading the "pecuniary interest" test, the Court finds that the California Litigation was brought primarily to protect the State of California's pecuniary interest and not primarily to protect the public safety or health of the citizens of California. The Court's decision has no impact upon any refund or other claims alleged in the California Complaint; those issues will ultimately be adjudicated, either (1) in this forum in the claims adjudication process, or (2) in another forum if an application to lift the section 362(a) automatic stay were to be granted.

2. *The "Public v. Private Rights" Test: The California Litigation Is an Exercise in Forum Shopping and the Adjudication of Private Rights*

Additionally, the Court finds that in bringing the California Litigation, the Attorney General has sought to adjudicate the rights of a private litigant. The California Litigation is an action for monetary relief where the Attorney General is seeking to liquidate its claims against the Debtors outside the Bankruptcy Court without having to seek relief from the section 362(a) automatic stay. Because restitution is the primary aim of the California Litigation, the Attorney General is merely acting as a creditor or an entity in a private class action. *See Pacific Land Research*, 20 Cal.3d at 17, 141 Cal.Rptr. 20, 569 P.2d 125 ("the return of the money illegally obtained ... is not the primary object of the

---

**9.** Recently, the United States Court of Appeals for the Ninth Circuit rendered a decision with respect to a FERC ruling. *See State of California, ex rel. Lockyer v. F.E.R.C.*, 383 F.3d 1006, 1008, 2004 WL 2002833, at *1 (9th Cir.2004). In *State of California, ex rel. Lockyer v. F.E.R.C.*, the Ninth Circuit upheld FERC's market rate based pricing, however, it reversed FERC's determination that refunds could not be awarded for violations of its reporting requirements, and remanded the case to FERC for refund proceedings. *Id.* It is the Court's understanding that the State of California was the lead plaintiff in that litigation.

suit, as it is in most private class actions."). The Court finds that the Attorney General is simply trying to adjudicate the claims that are pending in this Court outside the claims adjudication process without establishing cause to lift the section 362(a) automatic stay. Having reviewed the arguments of the parties regarding the "public v. private rights" test, the Court finds that the California Litigation was brought to protect the State of California's "private" rights, and therefore, is not excepted under section 362(b)(4) from the section 362(a) automatic stay. The act of bringing the California Litigation was nothing more than seeking to adjudicate the State of California' pecuniary interest in the forum of its choice without the burden of establishing cause to do so under section 362(a).

As stated above, the Court finds that the California Litigation was brought primarily in the State of California's pecuniary interest and to protect its private rights, and not primarily to promote public safety and welfare or to effectuate public policy. Hence, the automatic stay applies and the California Litigation is void *ab initio*. As stated above, the Court's decision has no impact upon any refund or other claims alleged in the California Complaint; those issues will ultimately be adjudicated either in this forum, in the claims adjudication process, or in another forum, if an application to lift the section 362(a) automatic stay were to be granted. Further, as noted above, the Court finds that the California Litigation would not serve any additional deterrence beyond that which is served by the FERC proceedings and the United States Attorney's criminal prosecutions.

### CONCLUSION

For the foregoing reasons, the California Complaint is void *ab initio* as the Court finds that the California Complaint is filed in violation of section 362(a) and is not excepted from the automatic stay by section 362(b)(4). Therefore, the Attorney General is directed to take all action necessary to dismiss the action pending in the United States District Court for the Northern District of California within five (5) business days of the entry of an order consistent with this memorandum decision. Further, the evidentiary objections by the Attorney General are hereby overruled. The Court does not find that the Enron Plaintiffs' request for a permanent injunction under Rule 65 of the Federal Rules of Civil Procedure, made applicable hereto by Rule 7065 of the Federal Rules of Bankruptcy Procedure, is warranted at this time. With respect to the alternative relief sought by the Enron Plaintiffs' under section 105, the Court, having determined the California Litigation is void *ab initio*, need not reach the issues raised regarding that request for relief.