# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00148-CV

**TXU Generation Company, L.P.; TXU Portfolio Management Company, L.P.; Oncor Electric Delivery Company; Coalition of Wholesale Electric Market Participants; Occidental Chemical Corporation; Occidental Permian, Ltd.; Occidental Power Marketing, L.P.; Occidental Power Services, Inc.; Oxy Vinyls, L.P.; Ingleside Cogeneration, L.P.; and Coral Power, L.L.C., Appellants**

**v.**

**Public Utility Commission of Texas, Appellee**

---

### DIRECT APPEAL FROM THE PUBLIC UTILITY COMMISSION OF TEXAS

---

### O P I N I O N

In this direct appeal, we consider a challenge to the validity of the Public Utility Commission's rule, 29 Tex. Reg. 1899 (2004) (to be codified at 16 Tex. Admin. Code § 25.503 (Pub. Util. Comm'n)),[1] governing its oversight of the competitive wholesale electricity market. Appellants and intervenor (collectively, "market participants")[2] contend that the WMO Rule (1)

---

[1] Although the commission's rule has not yet been codified, we will use its administrative code citation for the sake of clarity and convenience. We will refer to the rule as the Wholesale Market Oversight Rule (WMO Rule).

[2] Appellants include TXU Generation Company, L.P., TXU Portfolio Management Company, L.P., TXU Electric Delivery Company (collectively, TXU); Coalition of Wholesale

exceeds the Commission's statutory authority, (2) is unconstitutionally vague, (3) represents an unconstitutional taking, and (4) was passed in violation of provisions of the Administrative Procedure Act (APA). We affirm the Commission's order adopting the rule.

## BACKGROUND

An understanding of the structure of the electricity market in Texas is important to a proper determination of the validity of the challenged rule. The electricity market is unlike an ordinary market for goods or services because of the unique attributes of electricity. Electricity cannot be easily stored once it is generated and it relies on a complex infrastructure to deliver electric power from generators to the consumer. Because of constraints in the transmission system, electric power generated in some areas of the market may not be available for use in other locations. As we will discuss throughout this opinion, these attributes create problems that do not arise in other competitive markets.

There are three principal components to the electricity industry: "generation of power; transmission of that power on high-voltage lines over long distances; and distribution of power over shorter distances to the ultimate consumer." *City Pub. Serv. Bd. of San Antonio v. Public Util. Comm'n*, 9 S.W.3d 868, 870 (Tex. App.—Austin 2000), *aff'd*, 53 S.W.3d 310, 312 (Tex. 2001). The entire industry has historically been considered a natural monopoly. *Reliant Energy, Inc. v. Public*

---

Electric Market Participants (Coalition); Occidental Chemical Corporation, Occidental Permian, Ltd., Occidental Power Marketing, L.P., Occidental Power Services, Inc., Oxy Vinyls, L.P., Ingleside Cogeneration, L.P. (collectively, Occidental); Coral Power, L.L.C.; and Texas Genco, L.P. is the intervener.

*Util. Comm'n*, 101 S.W.3d 129, 133 (Tex. App.—Austin 2003), *rev'd and remanded Centerpoint Energy, Inc. v. Public Util. Comm'n*, 143 S.W.3d 81 (Tex. 2004). More recently, in recognition that the power generation and power distribution components of the electricity industry are not monopolies warranting strict regulation, the legislature has opened the wholesale electricity markets and retail electricity market to competition and market forces. *See* Tex. Util. Code Ann. § 39.001(a) (West Supp. 2004-05) (production and sale of electricity not monopoly warranting regulation of rates, operation and services). The transmission component of the industry remains closely regulated by the Commission. *See* Tex. Util. Code Ann. § 35.004 (West. Supp. 2004-05). This aspect of the industry is administered by the independent organization Electric Reliability Council of Texas (ERCOT).[3]

The WMO Rule at issue applies primarily to participants in the wholesale electricity market. Both electric power and capacity are available in the wholesale market through (1) bilateral agreements and (2) the balancing energy services (BES) or ancillary services market.[4] *See Tex. Com. Energy v. TXU Energy, Inc.*, 2004 U.S. Dist. LEXIS 13908, at *11 (S.D. Tex. June 24, 2004). The unique nature of electricity presents challenges to the industry. The transmission of electric power relies on a complex transmission grid which itself needs to be balanced by either adding power or removing power from the grid. The transmission grid is kept in balance with power and capacity

---

[3] ERCOT is also a term used to refer to the transmission system which provides power to roughly 85 percent of the State.

[4] The BES is a market for same day purchases of power made in fifteen-minute intervals. The ancillary services market is a market for same day or day-ahead purchases of capacity.

3

purchased through the BES market. Although the majority of electric power is bought and sold through bilateral contracts, retailers may purchase short term power through the BES market as well. *See id*. at *7.

In restructuring electricity markets in favor of competition, the legislature was aware that the unique nature of electricity and the industry was not wholly consistent with a fully deregulated market and the application of established antitrust principles. In recognition of this fact, the legislature decided to retain a regulatory scheme with regard to transmission services. *See* Tex. Util. Code Ann. § 35.004. It allowed utilities to recover the costs of prudently incurred expenditures that were rendered unrecoverable as a result of the deregulated market. *See id*. §§ 39.251-.265 (West Supp. 2004-05); *Reliant Energy*, 101 S.W.3d at 132. Specific consumer protection provisions were added to ensure that deregulation, in fact, achieves a benefit to the consumer. *See id*. § 39.101 (West Supp. 2004-05).

Furthermore, the legislature directed the Commission to monitor and address market power abuses associated with the generation, transmission, distribution, and sale of electricity. *See id*. § 39.157 (West Supp. 2004-05). A review of the record reflects that the legislature's concerns about anticompetitive practices and manipulation in the wholesale market were well founded.

One instance of market manipulation involved power generators overscheduling the amount of power they anticipated adding to the transmission grid. This overscheduling created congestion in the grid which those same generators were then paid to relieve. The Commission became aware of this practice and eventually required participants to refund $30,000,000 obtained as a result of these improper practices. *See Tex. Com. Energy*, 2004 U.S. Dist. LEXIS 13908, at *13.

4

The Commission has identified the practice of "hockey stick bidding" as another example of anticompetitive manipulation of the wholesale market. This bidding process involved a pricing strategy that created short term artificial price spikes in the BES market. *See id*. at \*14-15 (describing February 2003 price spike in BES market). A Commission report states that this bidding practice added at least $17 million in additional cost to power used over the course of two days in February 2003.

The Commission has also given considerable attention to the conduct of market participants in the California electricity market where abusive practices resulted in power shortages and soaring prices. *See Enron Corp. v. California ex rel. Lockyear* (*In re Enron Corp.*), 314 B.R. 524, \*8-11 (D.N.Y. Sept. 29, 2004) (describing manipulation of California wholesale electricity market). Against the backdrop of these abusive practices, the Commission established the WMO Rule to articulate standards that the Commission will apply in monitoring the activities of those participating in the wholesale electricity markets. *See* 16 Tex. Admin. Code. § 25.503(a).

The WMO Rule addresses the Commission's oversight of the wholesale market by enumerating the duties of market participants and defining prohibited activities. *See id*. § 25.503(f),(g). The rule provides a defense to a market participant who engages in a prohibited activity if the participant demonstrates that the otherwise prohibited activity served a legitimate business purpose and that its adverse effects were not foreseeable. *See id*. at § 25.503(h). The rule defines the role of ERCOT in enforcing operating standards for market participants and establishes a process for market participants to clarify ERCOT protocols to ensure compliance. *See id*. at §25.503(i),(j). Finally, the rule establishes record-keeping requirements for market participants and

ERCOT, and details the Commission's investigation process. *See id*. at §25.503(k),(l). The challenges raised in this direct appeal apply almost exclusively to those portions of the rule that define the duties of market participants and those activities which are prohibited.

## DIRECT APPEAL

In a direct appeal of a Commission rule pursuant to section 39.001(e) of the Public Utilities Regulation Act (PURA), we are limited to reviewing the rule's validity. *See* Tex. Util. Code. Ann. § 39.001(f) (West Supp. 2004-05); *Office of Pub. Util. Counsel v. Public Util. Comm'n*, 104 S.W.3d 225, 232-33 (Tex. App.—Austin 2003, no pet.), *City Pub. Serv. Bd. v. Public Util. Comm'n*, 96 S.W.3d 355, 359 (Tex. App.—Austin 2002, no pet.). A validity challenge tests a rule on procedural and constitutional grounds. *City of Alvin v. Public Util. Comm'n*, 143 S.W.3d 872, 878 (Tex. App.—Austin 2004, no pet.). A validity challenge may also question the agency's statutory authority to promulgate the rule. *Id*. An agency rule is presumed valid, and the challenging party bears the burden to demonstrate its invalidity. *Office of Pub. Util. Counsel*, 104 S.W.3d at 232. In this case, the market participants raise issues concerning the statutory authority of the Commission to promulgate the WMO Rule, the constitutionality of the rule, and the procedures through which the rule was enacted.

## STATUTORY AUTHORITY

All of the market participants contend that, by enacting the WMO Rule, the Commission has assumed powers that are not authorized by the legislature. The Commission is a creature of the legislature and has no inherent authority. *Public Util. Comm'n v. GTE-Southwest,*

6

*Inc.*, 901 S.W.2d 401, 406 (Tex. 1995). It "may exercise only those specific powers that the law confers upon it in clear and express language. As a general rule, the legislature impliedly intends that the agency should have whatever power is reasonably necessary to fulfill a function or perform a duty that the legislature has expressly placed in the agency." *Id.* at 407. Absent specific or implied statutory authority, an agency rule is void because it is made without legal authority. *Office of Pub. Util. Counsel*, 104 S.W.3d at 232.

The Commission may not exercise what is effectively a new power or a power contradictory to the statute based merely on a claim that the power is expedient for administrative purposes. *GTE-Southwest, Inc.*, 901 S.W.2d at 406. Although a rule must comport with the Commission's authorizing statute, the legislature does not need to include every specific detail or anticipate all unforeseen circumstances. *Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 687 (Tex. 1992). To establish the WMO Rule's facial invalidity, the market participants must show that the rule: (1) contravenes specific statutory language; (2) runs counter to the general objectives of the statute; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *See City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 236 (Tex. 2001); *Office of Pub. Util. Counsel*, 104 S.W.3d at 232. In construing the Commission's authority, we look to the statute as a whole, not any specific provision in isolation. *Reliant Energy, Inc. v. Public Util. Comm'n*, 62 S.W.3d 833, 839 (Tex. App.—Austin 2001, no pet.).

We give serious consideration of the Commission's interpretation of PURA, as long as that interpretation does not contradict the plain language of the statute. *Continental Cas. Co. v.*

7

*Downs*, 81 S.W.3d 803, 807 (Tex. 2002). The legislature intends to give an agency, created to centralize expertise in a certain regulatory area, a large degree of latitude in the methods it uses to accomplish its regulatory function. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 197 (Tex. 1994). However, we need not give as much deference to an agency's interpretation of its statute if that interpretation deals with a non-technical question of law or a matter outside of the agency's expertise. *Rylander v. Fisher Controls Int'l., Inc.*, 45 S.W.2d 291, 302 (Tex. App.—Austin 2001, no pet.).

**Statutory Powers of the Commission**

Before addressing the contentions of the market participants, it is useful to review the relevant statutory powers granted to the Commission by the legislature. Section 39.001(a) of PURA explains that the statute's purpose is to "protect the public interest during the transition to and in the establishment of a fully competitive electric power industry." Tex. Util. Code Ann. §39.001(a). Section 39.001(d) states that this objective is to be carried out through competitive rather than regulatory means to the greatest extent feasible, and that the Commission's rules should be "practical and limited so as to impose the least impact on competition." *Id*. § 39.001(d). Several provisions of the statute deal directly with the Commission's authority to oversee the behavior of participants in the wholesale electricity market.

The statute clearly gives the Commission broad authority to create rules governing the conduct of market participants in the BES and ancillary services market. Section 35.004(e) states:

8

> The commission shall ensure that ancillary services necessary to facilitate the transmission of electric energy are available at reasonable prices with terms and conditions that are not unreasonably preferential, prejudicial, predatory, or anticompetitive.

*Id*. § 35.004(e).[5] In addition the Commission has the authority to address the abuse of market power. Section 39.157 commands the Commission to monitor the market power of those involved in generation, transmission, distribution, and sale of electricity and to remedy abusive behavior by seeking an injunction or civil penalties, imposing administrative penalties, or suspending, revoking, or amending a participant's certificate or registration. *Id*. § 39.157(a) (West Supp. 2004-05). Market power abuses include predatory pricing, withholding of production, precluding entry, and collusion. *Id*.

The Commission is also charged with protecting the consumer. For example, the Commission must ensure that, by the time set for the establishment of competition in the retail electricity market, protections are in place which entitle customers to "safe, reliable, and reasonably

---

[5] Coalition contends that the final sentence in section 35.004(e) negates the Commission's authority over the ancillary services market once customer service is introduced. The final sentence of section 35.004(e) states:

> On the introduction of customer choice in the ERCOT power region, acquisition of generation-related ancillary services on a nondiscriminatory basis *by the independent organization in ERCOT* on behalf of entities selling electricity at retail shall be deemed to meet the requirements of this subsection.

Tex. Util. Code Ann. §35.004(e) (West 2004-05) (emphasis added). Reading the statute as a whole, however, it is clear that the legislature intended that only acquisitions of ancillary services by the independent organization would be deemed to meet the requirements of the section. This is because the independent organization is not affiliated with any market participant and is already subject to Commission oversight. *See id*. § 39.151.

priced electricity." *Id*. § 39.101(a)(1) (West Supp. 2004-05). A retail electricity customer is entitled to protection from unfair, misleading, or deceptive practices. *Id*. § 39.101(b)(6). The Commission is also directed to modify its rules regarding customer protections to ensure that "at least the same level of customer protection against potential abuses and the same quality of service that exists [prior to competition], is maintained in a restructured electricity market." *Id*. § 39.101 (f). Although the focus in section 39.101 is on the retail market, both wholesale and retail rates are now set by the market, and consequently, behavior in the wholesale market which affects price and reliability will directly impact the retail market as well.

**Commission's Authority Over the Wholesale Market**

We initially address Coalition and Coral Power's contention that the WMO Rule is invalid because it unlawfully usurps authority granted to ERCOT by the legislature. *See City Pub. Serv. Bd.*, 53 S.W.3d at 316 (as creature of legislature, Commission has no authority beyond those powers conferred by legislature). PURA section 39.151 calls for the establishment of an independent organization charged with ensuring:

(1) access to transmission and distribution systems;

(2) reliability and adequacy of the regional electric network delegates;

(3) timely distribution of information concerning customer choice; and

(4) accurate accounting of production and delivery in the wholesale market.

Tex. Util. Code Ann. § 39.151(a). ERCOT is the established independent organization for most of the State of Texas. *See Hammack v. Public Util. Comm'n*, 131 S.W.3d 713, 719 (Tex. App.—Austin

10

2004, pet. denied). Coalition and Coral Power insist that legislature granted this authority to ERCOT and limited the Commission's role in these matters to "oversight and review." *See id*. § 39.151(d). They contend that the WMO Rule's detailed provisions governing the conduct of market participants oversteps the role of oversight and review and assumes powers delegated to ERCOT.

Coalition and Coral Power's contention is based on an incomplete reading of the statute. The provision granting the commission "oversight and review" authority states:

> An independent organization certified by the commission for a power region shall establish and enforce procedures *consistent with this title and the commission's rules* relating to the reliability of the regional electric network and accounting for the production and delivery of electricity among generators and all other market participants. The procedures shall be subject to commission oversight and review.

*Id*. (emphasis added). Here, the plain language of the statute anticipates that the Commission will have rules relating to reliability and accounting because the independent operator's procedures are to be made consistent with the Commission's rules. Although Coalition and Coral power may question the wisdom of establishing overlapping procedures of the independent organization and Commission rules relating to reliability and accounting, this is a matter to be addressed to the legislature.

Coalition further contends that the Commission lacks the statutory authority to prohibit market power abuses in the wholesale bilateral contracts market. However, the statute gives the Commission broad authority to monitor and remedy market power abuses. *See id*. § 39.157(a). Indeed, some of the specific examples of market power abuses listed in the statute are clearly possible in the wholesale bilateral contracts market. Furthermore, the structure of the Texas

electricity system requires the Commission to act in the wholesale market in order to fulfill its statutory obligations to protect the consumer. In our system, price fluctuation in the wholesale market will be reflected in the retail market. Thus, abusive practices in the wholesale market will have a direct effect on price and reliability in the retail market. Because we find that the statute gives both the Commission and ERCOT authority to address the behavior of market participants in the wholesale market, and that such authority extends to the bilateral contracts market, we overrule Coalition and Coral Power's challenge to the validity of the rule on these grounds.

**Intent as an Element**

Next, Occidental, TXU, and Texas Genco challenge the WMO Rule on the grounds that it lacks an intent element in defining prohibited conduct. *See* 16 Tex. Admin. Code § 25.503(g). They argue that the Commission lacks the statutory authority to prohibit conduct that is not intentional and that the prohibition's inclusion of unintentional conduct runs counter to the general objective of the statute to impose only "practical and limited" rules favoring competition rather than regulation. However, Occidental, TXU, and Texas Genco's argument relies on the incorrect assumption that the only statutory basis for the WMO Rule's prohibited activities is the prevention of market power abuse pursuant to PURA section 39.157. Because we hold that the Commission is empowered to regulate conduct in the wholesale market for the purposes of protecting consumers and ensuring reasonably priced power for ancillary services, we will overrule Occidental, TXU, and Texas Genco's contention.

Texas Genco directs this Court to antitrust principles in the context of interpreting the term "market power abuses." It contends that the element of intent is inherent in the term

12

"market power abuse" and therefore any prohibited activities included in the rule must also contain an element of intent. In fact, the United States Supreme Court has read an intent element into the Sherman Antitrust Act. *See Verizon Communications Inc v. Trinko*, 124 S. Ct. 872, 878-79 (2004); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). The Sherman Act prohibits monopolization and does not expressly contain an element of intent. 15 U.S.C.A. § 2 (West 1997) ("Every person who shall monopolize . . . shall be deemed guilty."). The court explained that an offense under the act requires, "in addition to the possession of monopoly power in the relevant market, 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Verizon*, 124 S. Ct. at 878 (citing *Grinnell Corp.,* 384 U. S. at 570–571). The court further justified reading willfulness into the statute:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.

*Id*. at 878-79. Similarly, the Supreme Court has interpreted language in the Securities and Exchange Act which prohibits the use of any "manipulative or deceptive device or contrivance" in the sale or purchase of securities to include an element of willfulness. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1975) (terms "manipulative, device, and contrivance" indicate willful conduct).

Although antitrust law does not control our interpretation of PURA,[6] the reasoning of the Supreme Court in interpreting the Sherman Antitrust Act and the Securities and Exchange Act is persuasive when interpreting the Commission's authority to monitor and remedy "market power abuse." *See* Tex. Util. Code Ann. 39.157(a). Abuse is defined as "a corrupt practice" or "deceitful act." Webster's New International Dictionary 8 (3rd ed. 1986). The term "market power abuse" suggests that the legislature intended to prohibit only intentional or willful conduct. *See Ernst & Ernst*, 425 U.S. at 197.

Section (g) of the WMO Rule prohibits "any act or practice that materially and adversely affects the reliability of the regional electric network or the proper accounting for the production and delivery of electricity." While this general prohibition lacks any element of intent, the rule then lists a number of specific practices that all appear to include an element of intent. The dissent insists that an element of intent be implied in the WMO Rule. If the authority for this rule was derived only from section 39.157(a) governing "market power abuse," we would agree that an element of intent is implied. However, we look to the statute as a whole, not any specific provision in isolation, to determine the Commission's statutory authority. *See Reliant Energy*, 62 S.W.3d at 839.

The dissent, Occidental, TXU, and Texas Genco all contend that the absence of an intent element in the WMO Rule exceeds the Commission's statutory authority. The dissent states

---

[6] Texas Genco cites language in PURA section 39.158(b) that the statute is intended to complement other existing state and federal antitrust law. It contends that this provision indicates the legislature's intent that the statute be construed using "established antitrust principles." Texas Genco's contention is based on a reading of one sentence in section 39.158(b) in isolation. Section 39.158(b) has nothing to do with construing other provisions within the statute; it merely states that the remedies in the statute were intended to add to, not replace, existing antitrust provisions.

that both chapter 39 of PURA and the Texas Free Enterprise and Antitrust Act seek to balance the policy goals of promoting competition and protecting the integrity of market mechanisms. It then concludes that the majority ignores these antitrust principles. The dissent overlooks a vital objective of PURA—to protect the consumer in the new competitive marketplace. *See* Tex. Util. Code Ann. §§ 39.001(a) (West 2004-05) ("this chapter is enacted to protect the public interest during the transition to and the establishment of a fully competitive electric power industry"), 39.101 (a) (1) (consumers entitled to safe, reliable, and reasonably priced electricity) (West 2004-05). As we will discuss below, the Commission also has statutory obligations to protect consumers in a deregulated market and to ensure reasonably priced ancillary services for the transmission of electricity. The WMO Rule's prohibition of some unintentional conduct is authorized by these additional statutory powers. *See id.*; Tex. Util. Code Ann. § 35.004(e) (West 2004-05).

Reviewing the Commission's order, it is clear that the Commission relied on the consumer protection provisions of PURA as a basis for its authority in drafting the WMO Rule, as well as the market power abuse provision in section 39.157. *See* 29 Tex. Reg. 1905 (purpose of the WMO Rule is to protect consumer). Section 39.101(a) of PURA commands the Commission to establish protections which ensure that customers receive "safe, reliable, and reasonably priced electricity." Although section 39.101 was established to protect retail customers, the legislature has decided that both the retail and wholesale electricity markets should be governed by market forces. Thus, issues relating to reliability or price in the wholesale market will necessarily be reflected in the retail market.[7] In the market system established by the legislature, the Commission would be

---

[7] Texas Genco acknowledges in its reply brief that increased prices in the Texas wholesale market will be reflected in the retail market by distinguishing the Texas industry from California

unable to ensure retail customers "safe, reliable, and reasonably priced electricity" if its authority did not extend to the wholesale market. *See GTE-Southwest, Inc.*, 901 S.W.2d at 407 (legislature impliedly intends agency has all power reasonably necessary to carry out statutory function).

In addition, the legislature specifically directed the Commission to oversee the wholesale market to ensure reasonably priced electric power for ancillary services. Tex. Util. Code Ann. 35.004(e). In the existing competitive wholesale market, scarcity of electric power will be reflected in higher prices throughout the market, including prices for ancillary services. Thus, the Commission's statutory authority to ensure that ancillary services are available at reasonable prices necessarily implies the power to regulate conduct that materially and adversely affects reliability. *See GTE-Southwest, Inc.*, 901 S.W.2d at 407.

Although many of the prohibited activities enumerated in the rule clearly contain an element of intent, we will not imply an element of intent to the general definition of prohibited activities in section 25.503(g) of the WMO Rule. The WMO Rule reflects the Commission's decision, based on its expertise, that both intentional and unintentional actions in the wholesale market that adversely affect reliability must be prohibited in order to prevent market power abuse, ensure retail customers "safe, reliable, and reasonably priced electricity," and ensure reasonably priced electric power for ancillary services. *See Public Util. Comm'n*, 883 S.W.2d at 197 (deference given to agency interpretation of statute that relies upon agency expertise). We overrule Occidental,

where "utilities could not increase rates to reflect increases in wholesale power costs." Occidental also distinguishes the California system explaining that California "created a framework for retail competition whereby the regulated retail prices became significantly divorced from wholesale prices.

16

TXU, and Texas Genco's contention that the WMO Rule's definition of prohibited activity must contain an element of intent.

**Rule Not Inconsistent With Statute**

We also disagree with Occidental, TXU, and Texas Genco's contention that the prohibition of unintentional activities runs counter to the general objectives of the statute. They argue that the WMO Rule (1) favors regulation over competition, and (2) is not practical and limited in its impact on competition. *See* Tex. Util. Code Ann. § 39.001(d). Charged with preventing market power abuse, *see id*. § 39.157, ensuring safe, reliable, and reasonably priced electricity for consumers, *see id*. § 39.101(a)(1), and ensuring reasonably priced electricity for ancillary services, *see id*. § 35.004(e), the Commission established the WMO Rule which allows the market to set the price of electricity in accordance with the normal forces of supply and demand. Market participants are merely prevented from manipulating the market or acting in such a way as to disrupt the reliability of electricity service or artificially inflating price. Because the WMO Rule allows normal market forces to set the price of power, it does not favor regulation over competition. In fact, the limitations placed on market participants by the Commission exist for the purpose of fostering competition in a market that is uniquely vulnerable to disruption and manipulation.

The WMO Rule is also practical and limited. The rule is broad enough to encompass all activities that may materially affect reliability, but it is limited in its application. The affirmative defense provision allows market participants to demonstrate that activities which may have materially affected the reliability of electric service were in service of a legitimate business purpose and the resulting effect on the market was not foreseeable. *See* 16 Tex. Admin. Code § 25.503(h).

17

Occidental argues that the WMO Rule's informal investigation process in which a market participant may justify an otherwise prohibited activity is not "practical and limited." *See* Tex. Util. Code Ann. § 39.001(d). It explains that informal investigations are not limited in duration and subjects market participants to "significant financial risk and uncertainty." However, we hesitate to second guess the Commission's determination that the WMO Rule is a practical and limited means to achieve the Commission's legitimate goals. The WMO Rule balances the sometimes competing statutory obligations of establishing a competitive market for electricity and ensuring safe, reliable, and reasonably priced power for consumers and ancillary services by allowing market forces to set the price of electricity, but prohibiting market manipulation and activities that will materially affect reliability. The Commission was undoubtably aware that even an informal investigation of those who might innocently engage in prohibited activities would impose a burden on the market participant. But the Commission's balancing of its statutory obligations through the WMO Rule relies upon the Commission's considerable understanding of the operation of the electricity market and this is precisely the sort of agency interpretation that courts should give deference to. *See Public Util. Comm'n*, 883 S.W.2d at 197. We overrule Occidental, TXU, and Texas Genco's contention that the rule is inconsistent with the general objectives of the statute.

**Burden of Proof**

Because we hold that no intent element is mandated by statute, we also reject the market participants' contentions and the comments by the dissent that the WMO Rule impermissibly shifts the burden of proof on intent to market participants through the affirmative defense provision in section 25.503(h). More specifically, Occidental and Coalition insist that the WMO Rule is

18

invalid because it generally shifts the burden of proof from the Commission to market participants. Coalition contends that section 25.503(l)(4) of the WMO Rule requires only a minimal showing of a violation before it shifts the burden to a market participant to prove its innocence. However, this provision governs the Commission's procedure for requesting the initiation of an enforcement proceeding after an informal fact-finding review, not the standards to be applied at such a hearing. The rule requires the Commission to include specific information regarding its investigation "as part of its prima facie case." *Id*. § 25.503(l)(4)(A)-(D). We note that the rule does not equate the required information with a prima facie showing of a violation in an enforcement proceeding. Rather, it enumerates specific showings to be made by the Commission in order initiate an enforcement proceeding. Our reading of the language of the WMO Rule is confirmed by the Commission's admission in its post-submission letter brief comparing the required showing of prohibited conduct to a showing of probable cause and explaining that "[s]ubsection (l) does not describe the evidence required for the Commission to find at the conclusion of [an enforcement action] that a market participant has violated the Rule." As referenced by the WMO Rule, an enforcement action is governed by the procedures laid out in section 22.246 of the administrative code. *See* 16 Tex. Admin. Code § 22.246 (administrative penalties).[8] Because section 25.503(l)(4) does not establish a burden of proof for enforcement proceedings, we reject Occidental and Coalition's challenge to the validity of the WMO Rule on these grounds.

---

[8] Although the burden of proof is not discussed in section 22.246 of the administrative code, the Commission states in its post-submission letter brief that "in all cases the burden is on the Commission staff to demonstrate the elements of a prima facie case to the satisfaction of an administrative law judge, if applicable, and ultimately to the Commissioners as decisionmakers."

**Scope of the Remedy**

Coalition also contends that section 25.503(m) impermissibly expands the Commission's authority by authorizing the imposition of "any legal remedy" for a violation of the rule by a market entity. However, the preamble of the rule states that subsection (m) was not intended to expand or limit the types of remedies available to the Commission. Furthermore, the Commission concedes in its brief that it only has authority to impose those remedies available under PURA. We agree that subsection (m) of rule 25.503 applies only to those remedies specifically authorized in PURA. *See* Tex. Util. Code Ann. §§ 15.023, .028, .030 (West 1998).

**No Impermissible Regulation of Price**

Coalition and Coral Power next contend that the Commission's rule impermissibly regulates the price of electricity by requiring market participants to charge marginal cost prices. This contention relies on language in the preamble to the rule that states, "[p]ricing in excess of marginal cost by a seller who is immune from the chastening hand of competition is an abuse of market power," and on additional language that the Commission has a duty to protect the public from prices that are "substantially above the marginal cost of a marginally efficient unit when not tempered by competition." 29 Tex. Reg. 1916. We do not read these statements in the preamble to set the price of power at "marginal cost." In fact, the Commission deleted a provision in its proposed rule which did exactly that. Read in context, the preamble merely makes the wholly unremarkable observation that prices that are substantially above the marginal cost of power from the most expensive generating unit, under circumstances where there is no possibility of a competing offer, are harmful to the public. In light of the administrative record and the explicit statements by the Commission

20

that the WMO Rule does not require marginal-cost pricing, we find no merit in the theory that a market participant will be coerced into setting prices at an unprofitable rate out of an unsubstantiated fear that the Commission will initiate an investigation.

In a related point, Coalition and Coral Power defend the market's susceptibility to "temporary price spikes." They contend that the WMO Rule interferes with "the normal forces of competition," and thus imposes regulatory rather than competitive means to control market behavior. *See* Tex. Util. Code Ann. § 39.001(d). Presumably, Coalition and Coral Power adopt the reasoning of the Supreme Court in *Verizon*, that the opportunity to impose monopoly prices provides incentive to market participants to innovate and develop the industry. *See Verizon*, 124 S. Ct. at 878-79. Although the statute clearly anticipates competition in both the wholesale and retail markets, the Commission is also required to ensure that electricity is safe, reliable, and reasonably priced for consumers. *See id*. § 39.101(a)(1). We conclude that the Commission's rule adequately reflects the legislature's desire to balance market interests and consumer protections. We overrule Coalition and Coral Power's issues regarding the regulation of price.

**Market Power**

Coral Power contends that the Commission's concept of market power is inconsistent with the statute and case law defining market power. The WMO Rule specifies that a market participant's withholding of production constitutes an abuse of market power when that participant has "market power." The Commission explains in the preamble to the rule that its concept of market power is necessarily fluid:

21

In electricity markets, it is difficult to find markets that continuously operate under a competitive environment, and it is not unusual to find local market power in geographical pockets, even when the generation share of each resource owner is low, because transmission constraints or other reliability constraints often give some resource owners temporary or localized market power. Market power is a dynamic phenomenon in electricity markets, and the commission must have the ability to address abuses that occur during the times when the market is not competitive, even as those times become less frequent.

29 Tex. Reg. 1916. Coral Power points to a provision of the statute which limits a generator's share of installed capacity to twenty percent of the total. *See* Tex. Util. Code Ann. § 39.154(a). Coral Power also directs us to federal antitrust case law which states that claims of illegal monopolization under the Sherman Act should usually be rejected when the alleged monopoly possesses less than thirty percent market share. *See M & M Med. Supply & Serv. v. Pleasant Valley Hosp.*, 981 F.2d 160, 168 (4th Cir. 1992) (en banc) (citing 3 Philip Areeda & Donald F. Turner, Antitrust Law ¶ 835, at 350). Based on the statutory limit of generation capacity to twenty percent and federal antitrust law, Coral Power argues that the Commission may not adopt its own concept of market power which subjects to scrutiny those generators who possess less than twenty percent capacity.

We find no indication that the legislature intended to adopt twenty percent as a cutoff definition of market power. Had the legislature believed that a generation capacity of more than twenty percent is required to possess market power, then the limitations on generation capacity would render PURA section 39.157's prohibition on market power abuse irrelevant. *See Meritor Auto., Inc. v. Ruan Leasing*, 44 S.W.3d 86, 90 (Tex. 2001) (we presume entire statute intended to be effective and "[w]hen possible, each sentence, phrase, clause and word is given effect, so that the statute makes sense as a cohesive whole"). We also do not find the reasoning of the Fourth Circuit

in *M & M Medical Supply* to be applicable to the Texas electricity industry. *See* 981 F.2d at 168. The electricity industry is inherently different from commerce in other goods and services. The sale of electricity is bound to a transmission grid which may often obtain power or capacity only from certain generators in certain locations. It would make little sense to determine market power as a percentage of total capacity statewide in instances when only a portion of the capacity is actually available. Furthermore, the Commission has substantial expertise in the application of market forces to the electricity market. We grant deference to the Commission's interpretation of PURA when that interpretation is based on the Commission's specialized expertise. *See Public Util. Comm'n*, 883 S.W.2d at 197. We hold that it is appropriate for the Commission's rule to take into account the unique nature of the electricity industry in defining market power and that the rule is not inconsistent with the statute. We overrule Coral Power's challenge to the WMO Rule's use of the term market power.

## CONSTITUTIONAL CHALLENGES

**Vagueness**

All market participants allege that the WMO Rule is unconstitutionally vague. Their primary concerns focus on the general definition of a prohibited activity in section 25.503(g) and the prohibition of market power abuse in subsection (g)(7). The general provision prohibits "any act or practice that materially and adversely affects the reliability of the regional electric network or the proper accounting for the production and delivery of electricity." 16 Tex. Admin. Code § 25.503(g). The prohibition on market power abuse includes "withholding of production, whether economic

withholding or physical withholding, by a market participant who has market power." *Id*. § 25.503(g)(7). The WMO Rule does not define the term market power.

Because this is a direct appeal, we may consider only a facial challenge to the rule: that the rule is impermissibly vague in all of its applications. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982); *City Pub. Servs. Bd. of San Antonio*, 96 S.W.3d at 359. In a facial challenge, we will consider any limiting construction of the rule provided by the Commission. *See Village of Hoffman*, 455 U.S. at 494. Courts apply several standards of review to vagueness challenges, depending on the subject of the statute or rule at issue. We first note that the market participants do not allege that the WMO Rule impinges upon any constitutionally protected conduct, and therefore, we do not apply the higher scrutiny of an "overbreadth" challenge. *See Village of Hoffman Estates*, 455 U.S. at 494. Instead we will apply the standards for determining whether the rule is unduly vague.

We will find a rule unconstitutionally vague only if it (1) does not give fair notice of what conduct may be punished, and (2) invites arbitrary and discriminatory enforcement by its lack of guidance for those charged with its enforcement.[9] *Rooms with a View, Inc. v. Private Nat. Mortgage Ass'n, Inc.*, 7 S.W.3d 840, 845 (Tex. App.—Austin 1999, pet. denied); *see Village of*

---

[9] We decline the Commission's invitation to apply the less stringent standard for vagueness applicable to economic regulation. Where, as here, a rule or statute carries "'potentially significant civil and administrative penalties, including fines and license revocation,' quasi-criminal treatment is appropriate and thus the more strict standard of review applies." *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 508 (5th Cir. 2001) (citing *Women's Med. Ctr. of N. W. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001)).

*Hoffman Estates*, 455 U.S. at 498; *Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998). The United States Supreme Court has explained:

> Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'

*Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (citing *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Moreover, Justice Tom C. Clark noted that courts must take a realistic approach to ruling on vagueness:

> [F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952); *see Rooms with a View*, 7 S.W.3d at 845 (statute not automatically void for vagueness simply because it is difficult to determine whether certain "marginal" acts fall within its language).

The market participants contend that subsection (g) of the WMO Rule is unconstitutionally vague because it does not give fair notice of what conduct may be punished under the law. *See Rooms with a View*, 7 S.W.3d at 845. In determining whether a rule gives fair notice, we examine whether the rule conveys sufficiently definite warning as to the proscribed conduct when

25

measured by common understanding and practices. *See Pennington v. Singleton*, 606 S.W.3d 682, 689 (Tex. 1980). Because our concern is for those to whom the WMO Rule is directed, we scrutinize the rule by asking whether the ordinary participant in the wholesale electric power market could understand and comply with it. *See Commission for Lawyer Discipline*, 980 S.W.2d at 437 (disciplinary rules scrutinized under "ordinary lawyer" standard).

### Prohibited activities

Coalition, Texas Genco, TXU, and Occidental object to the general definition of a prohibited activity contained in the WMO Rule. *See* 16 Tex. Admin. Code § 25.503(g). TXU presents examples of mechanical failures and computer glitches which may adversely affect reliability or accounting. It contends that the rule gives insufficient notice because a market participant could be found to have engaged in a prohibited activity as a result of accidents or ordinary mechanical breakdowns. It argues that an open-ended, broadly worded prohibition is confusing, creates unknown risks to market participants and does not provide the specificity needed to allow market participants to take measures to avoid violations. The dissent acknowledges these contentions stating "the market participants go as far as to urge that [WMO Rule] is unconstitutionally vague, and they are not far off the mark. . . ." However, we do not read this subsection of the rule in isolation. *See Reliant Energy*, 62 S.W.3d at 839. The WMO Rule specifically states that activities that would otherwise be prohibited, including practices that materially and adversely affect reliability, are not violations when (1) they serve a legitimate business purpose consistent with prices set by competitive market forces, and (2) the adverse effect on reliability, price, or accounting was not known or foreseeable with the exercise of due diligence. 16

26

Tex. Admin. Code § 25.503(h). This provision gives clear notice that the unforeseen accidents described by TXU will not give rise to liability under the rule.[10] The fact that subsection (h) is an affirmative defense does not lessen the notice to market participants of what conduct is prohibited.[11] Certainly, participants in the wholesale electricity market can determine whether their actions are taken in the service of a legitimate business purpose that is not anticompetitive. Furthermore, the rule does not require clairvoyance as to whether an action will impact price, reliability, or accounting—only diligence.

Courts have upheld similarly general prohibitions when challenged for vagueness. For example, the Sherman Antitrust Act's prohibition on anticompetitive behavior merely states that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony." 15 U.S.C.A. § 2. This provision has consistently been found to provide fair notice. *See Nash v. United States*, 229 U.S. 373, 781-82 (1913);[12] *Atlas Building*

---

[10] The Commission also points out in its post-submission letter brief that the ERCOT protocols address issues such as scheduled maintenance and the shutdown of plants. When an action is authorized by ERCOT under its protocols, it is not a prohibited activity. *See* 16 Tex. Admin. Code § 25.503(g) (prohibited activity excludes acts or practices expressly allowed by ERCOT protocols or by official interpretations of protocols).

[11] TXU complains of the stigmatizing effect of informal commission investigations in which it is compelled to provide information demonstrating that certain actions served legitimate business purposes. However, we cannot conclude that an informal investigation, even when it is disclosed to the public, amounts to the sort of "punishment" which raises vagueness concerns.

[12] In *Nash*, Justice Holmes explained that the constitution's guarantee of fair notice does not equate to perfect notice:

> [T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If

*Prods. Co. v. Diamond Block and Gravel Co.*, 269 F.2d 950, 955 (10th Cir. 1959) (restraint of trade and monopolization provision of Sherman Act have long been sustained against claim of unconstitutional vagueness).

In *Pennington*, the state supreme court held that the Texas Deceptive Trade Practices—Consumer Protection Act (DTPA) provided adequate notice to survive a vagueness challenge. *Pennington*, 606 S.W.2d at 689-90. Although the supreme court allowed "greater leeway" noting that the DTPA is a regulatory statute governing business activity, the similarities between the DTPA and the WMO Rule make the reasoning persuasive. The DTPA contains a general prohibition that "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Tex. Bus. & Com. Code Ann. § 17.46(a) (West Supp. 2004-05). It then provides a non-exhaustive list of false, misleading, or deceptive acts. *Id*. § 17.46(b). The supreme court explained that the general nature of the statute was necessary:

> The boundaries of illegality under the DTPA must remain flexible because it is impossible to list all methods by which a consumer may be mislead or deceived.

---

his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. . . . The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.

*Nash v. United States*, 229 U.S. 373, 781-82 (1913).

*Pennington*, 606 S.W.2d at 689.[13] We note that the supreme court also declined to require an intent element in order for the statute to pass constitutional muster. *Id*. at 689-90.

The dissent counters that the United States Supreme Court has imposed an element of willfulness on the Sherman Act in order to cure vagueness. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko*, 124 S. Ct. 872, 878-79 (2004). However, this element of intent was imposed as a matter of statutory interpretation, not out of vagueness concerns. *See Verizon Communications*, 123 S. Ct. at 878-79; *see also Ernst v. Hochfelder*, 425 U.S. 185, 199 (1975) (construing language of Securities and Exchange Act to include element of intent).

The dissent also incorrectly construes language from the Texas Supreme Court's opinion in *Caller-Times Pub. Co. v. Triad Comm., Inc.*, 826 S.W.2d 576, 581 (Tex. 1992). There, the supreme court noted while interpreting the Texas Antitrust Act that a vague standard has a "chilling effect" on business. *Id*. Again, this statement was made as a matter of statutory interpretation, not in the context of a vagueness challenge. Moreover, the United States Supreme Court has found a constitutional violation from the "chilling effect" of a law only where the law's vagueness would limit rights that are afforded heightened constitutional protection, such as free

---

[13] In construing the DTPA, the supreme court noted the need for section 17.46(a)'s "catch-all" provision:

> A broad interpretation is warranted, however, due to human inventiveness in engaging in deceptive or misleading conduct. The legislature did not intend its express purpose of protecting consumers from false trade practices to be circumvented by those who would seek out loopholes in the Act's provisions.

*Pennington v. Singleton*, 606 S.W.2d 682, 688 (Tex. 1980).

speech.  *See Dumbrowski v. Pfister*, 380 U.S. 479, 486-87 (1965).  And even in the area of free speech, the United States Supreme Court has never considered the chilling effect of a law to be a sufficient basis, in and of itself, for prohibiting state action.  *Younger v. Harris*, 401 U.S. 37, 51 (1971).  Thus, we find no support in the decisions of the federal or state supreme courts for the proposition that the WMO Rule is unconstitutionally vague.[14]

We hold that the WMO Rule's general definition of prohibited activities provides the fair notice required by the constitution.  Reading the statute as a whole, we conclude that the broad language in the definition is tempered by the availability of a defense when a market participant has acted in accordance with ERCOT protocols, or has (1) pursued a legitimate business purpose and (2) exercised due diligence to avoid an adverse affect on prices, reliability and accounting.  *See* 16 Tex. Admin. Code § 25.503(h).  We overrule Coalition, Texas Genco, TXU, and Occidental's vagueness challenge to the WMO Rule's prohibited activities.

### Market power

All market participants contend that the Commission's failure to define market power in the WMO Rule renders it unconstitutionally vague.  They point to the prohibition of market power abuse, which includes, "[w]ithholding of production, whether economic withholding or physical withholding, by a market participant who has market power."  16 Tex. Admin. Code 25.503(g)(7).

---

[14] We also reject the dissent's argument that vagueness in the WMO Rule would "chill competition in a manner inconsistent with the legislature's intent."  As we have discussed above, the affirmative defense included in the WMO Rule alleviates much of the complained of uncertainty by giving a market participant guidance that, if it is diligent as to the effects of its actions on the market, the market participant will not be subject to liability under the rule.  Nor do we conclude that any remaining uncertainty in the WMO Rule would result in some sort of *de facto* regulation.

Market participants contend that, without a clear definition of market power, they cannot know if or when they possess market power and, therefore, are uncertain when the rule may apply to their decisions on when to operate generation resources and what price to set. Coral Power gives the example of its generation resources which may provide power to ERCOT or to the Southwest Power Pool (SPP). These resources consist of less than ten percent of the total ERCOT capacity. Coral Power continually decides whether to sell power to ERCOT or SPP based on the expected market price. It argues that, without a definition of market power, it cannot know whether the decision to sell power to SPP rather than ERCOT will be considered withholding and, therefore, a violation under section 25.503(g)(7). TXU asserts that the failure to define market power leaves enforcement of the market power abuse rule completely in the Commission's discretion, creating the possibility of arbitrary enforcement. *See Coffee City v. Thompson*, 535 S.W.2d 758, 763 (Tex. Civ. App.—Tyler 1976, writ ref'd n.r.e.).

Although the Commission agrees that a definition of market power is needed, it provides some guidance in the preamble to the WMO Rule. The Commission explains that the traditional concepts of market power do not fit the Texas electricity market. 29 Tex. Reg. 1916. It characterizes market power in the wholesale electricity market as a "dynamic phenomenon" and notes that constraints in transmission and reliability often give resource owners "temporary or localized market power." *Id*. The Commission points to similar language in an order by the Federal Energy Regulatory Commission (FERC) in the rulemaking record stating that market participants who normally do not possess market power may exercise market power in instances of extreme supply or demand conditions.

The lack of a well defined concept of market power does produce some uncertainty in the enforcement of the rule. However, this more fluid concept of market power does not render enforcement of the market power abuse provision so uncertain as to deprive market participants of constitutionally required fair notice. *See Boyce Motor Lines*, 342 U.S. at 340 ("no more than a reasonable degree of certainty can be demanded"). Notice is determined by reading the rule in its entirety. As we discussed above, section 25.503(h) of the rule exempts otherwise prohibited conduct when a market participant has acted in accordance with ERCOT protocols or has (1) pursued a legitimate business purpose and (2) exercised due diligence to avoid an adverse affect on prices, reliability and accounting. Thus, the examples brought forward where a market participant would be found to have engaged in prohibited conduct because it was not aware that it possessed market power are misplaced. The rule simply requires market participants to be diligent in avoiding adverse affects on the market. If a diligent inquiry would not reveal the adverse affect of legitimate activity on the market, the activity is excluded from the rule's definition of market power abuse.[15] *See id.*

The Commission's fluid concept of market power also does not create the possibility of arbitrary enforcement. TXU compares the failure to define market power in the WMO Rule with the ordinance in *Coffee City*, where the issuance of building permits was left to the "arbitrary discretion . . . of the city secretary without any rule or standard to follow." *Coffee City*, 535 S.W.2d

---

[15] Occidental contends that the prohibition on creating "artificial congestion" is unconstitutionally vague because "a market participant cannot create artificial congestion without knowing how others operate their units . . . and that market participants do not always have sufficient knowledge to anticipate the effects the their actions may produce." If, in fact, the market participant lacked access to information which would reveal the possibility of creating congestion, section 25.503(h) would exempt the conduct from prosecution as a prohibited activity. *See* 16 Tex. Admin. Code § 25.503(h).

at 763. By contrast, the WMO Rule provides detailed guidance on how violations of the rule are to be investigated, *see* 16 Tex. Admin. Code § 25.503(l)(1-3), prosecuted, *see id*. § 25.503(l)(4), and enforced. *See id*. § 22.246 (entitlement to a hearing before administrative law judge). Reading the WMO Rule in its entirety, and in context of other administrative code provisions dealing with enforcement, we conclude that the absence of a definition of market power does not render the rule unconstitutionally vague. We overrule all market participants' issues concerning the vagueness of the WMO Rule's use of the term market power.

### Miscellaneous provisions

A variety of other provisions in the WMO Rule have been challenged as unconstitutionally vague. The arguments supporting these contentions stem primarily from reading terms in the rule in isolation rather than in the context of the entire rule. *See Reliant Energy*, 62 S.W.3d at 839. We will address each specific contention to determine whether the rule provides the reasonable degree of certainty required by the constitution.

TXU contends that the rule is unconstitutionally vague because it fails to define what sort of conduct constitutes the "economic withholding" that is prohibited in section 25.503(g)(7). TXU recognizes the Commission's discussion of economic withholding in the preamble to the rule but claims that the Commission requires market participants to price power at "marginal cost," an equally undefined term. *See* 29 Tex. Reg. 1916. We have already held in this opinion that the rule does not "set prices" at marginal cost. The preamble gives an example of economic withholding in which a market participant would bid all or a large portion of its production "at a very high price, regardless of marginal costs." *Id.* The Commission explains that a market participant who has

market power can be assured that its artificially high bid will be selected often enough to compensate for those instances when the bids are not accepted because the market contains a sufficient supply at a reasonable price. *Id*. The prohibition on economic withholding was established to prevent the creation of artificial scarcity of reasonably priced power in the market. Considering the Commission's comments in the preamble, *see Village of Hoffman*, 455 U.S. at 494, and the fact that the rule does not set the price of power at marginal cost, we hold that the rule provides reasonable notice of the meaning of economic withholding to avoid vagueness.

Coalition challenges section 25.503(f)(12)'s requirement that a market participant "who identifies a provision in the ERCOT procedures that produces an outcome inconsistent with the efficient and reliable operation of the ERCOT-administered markets" call the provision to the attention of the appropriate ERCOT subcommittee. Coalition complains that a market participant may violate the rule simply because it does not share the Commission's evaluation of the intent or effect of a protocol. The rule defines "efficient operation of the market" as characterized by "the fullest use of competitive auctions to procure ancillary services, minimal cost socialization, and the most economical utilization of resources, subject to operational and other constraints." 16 Tex. Admin. Code Ann. § 25.503(c)(2). This definition certainly provides guidance of what the Commission is seeking. More importantly, the rule does not impose a duty to scour the protocols for inefficiency. There is a duty to report only if a market participant subjectively believes that a procedure produces an outcome inconsistent with the efficient and reliable operation of the market. The provision is not unconstitutionally vague.

Coalition complains that section 25.503(I) requires market participants to follow official interpretations of ERCOT protocols by ERCOT employees when the Commission may later

determine that the official interpretation violates the rule. It contends that provision violates due process by requiring market participants to comply with vague and inconsistent legal requirements. Again we find that the affirmative defense for actions taken with a legitimate business purpose—coupled with the exercise of due diligence as to the effect on reliability, price, and accounting—gives sufficient notice of what conduct may subject market participants to liability. *See id*. § 25.503(h). Although subsection (i)(6) does state that reliance on informal communication with ERCOT staff may not be relied on as an affirmative defense, reliance on an official interpretation by ERCOT would represent diligence under the rule.

Coalition also challenges the WMO Rule's guidance to the Commission in monitoring the activities of market participants as unconstitutionally vague. It points to provisions stating that the Commission will consider, *in monitoring the market*, whether an activity (1) materially reduced competitiveness of the market, including whether the activity unfairly impacted other market participants in a way that restricts competition, or (2) interfered with the efficient operation of the market. *See id*. § 25.503(d)(2),(4). Despite the reference to enforcement in the title, section 25.503(d) merely details subjects that the Commission should consider in *monitoring* the market. Because nothing in section 25.503(d) will subject a market participant to punishment, we overrule Coalition's vagueness challenge.

The Commission's rule does not enumerate all of the practices that are prohibited, but the constitution does not require such precision. We hold that each of the challenged provisions of the Commission's rule, when read in the context of the entire rule, provides reasonable notice of what conduct may be punished and does not invite arbitrary and discriminatory enforcement. *See*

35

*Village of Hoffman Estates*, 455 U.S. at 498; *Commission for Lawyer Discipline*, 980 S.W.2d at 437; *Rooms with a View*, 7 S.W.3d at 845. We overrule all of the additional vagueness challenges.

**Unconstitutional Taking**

Coalition and TXU contend that the WMO Rule results in an unconstitutional taking without just compensation. Because this is a direct appeal Coalition and TXU may only challenge the facial validity of the rule: that the rule constitutes an unconstitutional taking in all of its applications. *See Village of Hoffman Estates*, 455 U.S. at 494-95; *City Pub. Serv. Bd.*, 96 S.W.3d at 359. Both appellants cite language in the rule's preamble which they interpret as requiring a market participant to offer all of its capacity at "marginal cost" under certain circumstances. *See* 29 Tex. Reg. 1916-17. They contend that marginal cost does not encompass the full cost of producing power and therefore the rule results in an unconstitutional taking.

As we explained in our discussion of whether the WMO Rule regulates price and our discussion of economic withholding, the rule does *not* require market participants to sell power at marginal cost. The preamble merely states that offering power at a price substantially above the marginal cost of a producer's least efficient unit, when competing offers are unavailable, is an abuse of market power. Because we hold that the WMO Rule does not require market participants to sell power at marginal cost, the rule is not an unconstitutional taking in all of its applications.[16] We overrule Coalition and TXU's facial challenge to the rule as an unconstitutional taking.

---

[16] Counsel for TXU acknowledged at oral argument that a facial challenge would be inappropriate if the rule does not require a market participants to price power at marginal cost.

## COMPLIANCE WITH THE APA

Coral Power raises two issues contending the Commission failed to comply with the APA. Coral Power contends that the Commission (1) failed to provide adequate notice as required by sections 2001.024 and .029, and (2) failed to substantially comply with APA section 2001.033's requirement of a concise restatement of the statutory authority of the rule.

### Notice and Comment

Coral Power claims that the Commission failed to provide adequate notice that the WMO Rule would define market power to include "local" or "momentary" market power. *See* 29 Tex. Reg. 1916. It contends that nothing in the Commission's proposed rule indicated that market power would be interpreted outside of traditional notions of that term, and therefore, Coral Power was deprived of the opportunity for meaningful comment. *See Unified Loans, Inc. v. Pettijohn*, 955 S.W.2d 649, 651 (Tex. App.—Austin 1997, no pet.) ("Adequate notice is essential for fairness as well as a meaningful opportunity to comment on a proposed rule.").

The supreme court recently discussed the notice requirements of the APA in *Texas Workers' Compensation Commission v. Patient Advocates of Texas*, 136 S.W.3d 642, 649-50 (Tex. 2004). The supreme court cited a case from this court in which we held that proper notice is given when a proposed rule is changed to incorporate comments and "and no new subjects of regulation or persons besides those previously given notice are affected." *Id*. (citing *State Bd. of Ins. v. Deffebach*, 631 S.W.2d 794, 801 (Tex. App.—Austin 1982, writ ref'd n.r.e.)). The supreme court also discussed the federal standard for adequate notice under the federal APA stating that the modified final rule must be a "logical outgrowth" of the proposed rule. *Id*. "Stated differently, if

37

the final rule does not materially alter the issues addressed in the proposed rule, then notice will be deemed sufficient." *Id*. The supreme court concluded that the two standards are consistent:

> The relevant inquiry under both standards is whether the agency's notice fairly apprises affected parties of the pertinent issues to allow them to comment and participate in the rulemaking process in a meaningful and informed manner.

*Id*.

We hold that the Commission's proposed rule provided adequate notice of its more fluid concept of market power. The proposed rule contains a section prohibiting "economic withholding" and defines the term as "an offer of energy or capacity by a market participant in an amount sufficiently large that the market cannot clear without the offer." By defining economic withholding in terms of whether the market can clear without the offer, the Commission indicated that its prohibition on economic withholding would apply regardless of traditional notions of market power. Moreover, Coral Power's own comments in the rulemaking record regarding artificial shortages and withholding of power reflect that it had notice that the rule's provisions might affect it. Because the proposed rule apprised Coral Power that it would be affected, and Coral Power actually participated with meaningful comment, we hold that the Commission satisfied the notice requirements of the APA. *See id*. We overrule Coral Power's first issue concerning compliance with the APA.

**Concise Statement of Statutory Provisions**

Coral Power also contends that the Commission failed to provide a concise restatement of its statutory authority to enact the WMO Rule. *See* Tex. Gov't Code Ann.

§ 2001.033(a)(2) (West 2000). Specifically, it contends that the only stated purpose for the rule is to ensure reliability of electric power and that the rule oversteps the Commission's statutory powers to do so. Coral Power cites a statement in the third paragraph of the preamble that the new rule is needed to ensure reliability of the markets and power during the transition to a fully competitive market. 29 Tex. Reg. 1899. Based on this one sentence, Coral Power concludes that the Commission's stated authority is limited to its powers to ensure reliability during the transition to competition.

However, the paragraph following the one cited by Coral Power states that the WMO Rule was "proposed as part of the Commission's efforts to adopt competition rules to protect the public interest during the transition to and in the establishment of a fully competitive electric power industry under Chapter 39 of [PURA]." 29 Tex. Reg. 1899. The preamble lists those functions delegated to the commission by the statute:

> Among those functions were the adoption and enforcement of rules to ensure customer protections and customer entitlements; the establishment of rules governing ERCOT and oversight of ERCOT activities; the assessment of market power; and the mitigation of market power abuses.

29 Tex. Reg. 1900. The Commission then concludes that "in order to protect the public interest and to assure that prices are determined by the normal forces of competition, the commission finds that it must adopt this rule governing the enforcement of wholesale electricity markets and ERCOT administered markets." *Id*. Reading the preamble as a whole, we find that the Commission clearly stated that the purpose of the rule extends beyond reliability and includes protecting retail customers by addressing anticompetitive manipulation of the wholesale market.

Furthermore, the statutorily delegated functions listed by the Commission support its authority to enact the rule. Although the Commission does not enumerate the specific provisions in Chapter 39 of PURA that correspond with the delegated functions of ensuring reliability, protecting customers and addressing manipulation of the wholesale market, our review of the statute confirms that the Commission possesses these powers. The authority to ensure reliability is granted by the consumer protections in PURA sections 39.101(a)(1) (customer entitled to safe, reliable, and reasonably priced electricity) and 35.004(e) (relating to ancillary services market), and section 39.151(d) (independent organization's procedures shall be consistent with Commission rules regarding reliability). The authority to protect consumers stems from PURA section 39.101(a)(1), (b)(6) (customer entitled to be protected from unfair, misleading, deceptive practices), and (f) (commission shall modify rules to assure at least same quality of service that existed before transition to competition). Finally, the Commission's authority to address manipulation of the wholesale market is found in PURA section 39.157(a) (Commission shall monitor market power and address market power abuse), and through the statute's reliability and consumer protection provisions. Coral Power presents a chart in its brief that outlines why various statutory provisions do not grant the Commission authority to enact the rule. All Coral Power's arguments concerning the scope of the Commission's authority under the statute have been thoroughly discussed and rejected earlier in this opinion. We hold that the Commission complied with the APA by including a concise statement of its statutory authority to promulgate the rule.

Coral Power also contends that the Commission did not substantially comply with the APA because the Commission's reasoned justification does not demonstrate in a relatively clear and logical fashion that the rule is a reasonable means to a legitimate objective. *See* Tex. Gov't

40

Code Ann. § 2001.035 (West 2000). Coral Power argues that the rule "far exceeds" the Commission's statutory reliability oversight and enforcement responsibilities. However, Coral Power's argument is premised on the incorrect assumptions that the Commission's only objective in the rule is to ensure reliability and that other statutory provisions do not grant the Commission the authority to enact the rule. We have already held that the purpose of the rule also encompasses protecting consumers and preventing manipulation of the wholesale market. These are legitimate objectives authorized by the statute and Coral Power has not shown how the rule is not a reasonable means of protecting consumers and preventing manipulation of the market. Because the purpose of the WMO Rule extends beyond the objective of ensuring reliability, we overrule Coral Power's final substantial compliance challenge.

## CONCLUSION

In summary, the appellants and the dissent ignore what the legislature fully recognized when it restructured the state's electricity market: In this transition period, a purely competitive market would not serve the needs of either the utilities or the retail customers. For example, utilities must be allowed to recover their investment costs that might be stranded and not recouped in a market-driven rate structure; transmission and distribution must continue to be regulated to a degree; and the transition to a competitive market must also safeguard retail customers by ensuring "safe, reliable, and reasonably priced electricity." Chapter 39 of PURA gives the Commission the authority to address market power abuses, to provide reasonably priced ancillary services, to protect utilities from some losses resulting from deregulation, and to protect the

41

legislatively sanctioned "customer safeguards."[17] The Commission's enactment of the WMO Rule, giving it oversight of the wholesale market, furthers these combined statutory mandates and thus does not exceed the Commission's authority. Rather than chill competition, this rule reasonably promotes a form of competition most likely to accomplish the goals the legislature envisioned in restructuring the state's electric market.

We hold that (1) the Commission possessed the statutory authority to enact the WMO Rule, (2) the rule as adopted was consistent with the general objectives of the statute, (3) the rule is not unconstitutionally vague, (4) the rule does not constitute an unconstitutional taking, and (5) the Commission substantially complied with the requirements of the APA. Accordingly, we sustain the validity of the WMO Rule as enacted by the Commission.

_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton: Opinion by Justice B. A. Smith; Dissenting Opinion by Justice Pemberton

Affirmed

Filed: May 19, 2005

---

[17] "On or before June 30, 2001, the commission shall modify its current rules regarding customer protections to ensure that at least the same level of customer protection against potential abuses and the same quality of service that exists on December 31, 1999, is maintained in a restructured electric industry." Sec. 39.101(f).